# Sutter *versus* Dutch Church.

1. A majority of a church congregation may direct and control consistently with the particular and general laws of the organism, but not in violation of them.

2. When the charter of a religious congregation reserves the right in a majority to make a connection with any other Christian denomination when they shall think it to their advantage, they are not thereby empowered to dissolve such connection when made, and the right under this clause is exhausted by the act of union.

APPEAL in Equity from the decree of the Court of Common Pleas of *Philadelphia*.

*M. Russell Thayer and Garrick Mallery*, for appellants.

*Theodore Cuyler*, for appellees.

The facts of the case, together with the opinion of a majority of the court, by Chief Justice LOWRIE, will be found in 6th Wright's Rep. page 503.

From this decision Mr. Justice Thompson dissented, and held

[Sutter *v.* Dutch Church.]

that a majority of a religious congregation have power to dissolve their connection or union with a denomination with which they have connected themselves after their organization, and filed the following dissenting opinion :—

THOMPSON, J.—I cannot agree to a judgment of affirmation in either of the above cases, and it is due to the profession as well as to myself that the reasons for my dissent from the judgment of the majority of my brethren should be stated. The case presents some delicate and very nice points in civil jurisprudence. Indeed, I am greatly impressed with the idea that the boundary of mere civil jurisprudence has been transcended in arriving at conclusions below and here.

In order to a satisfactory understanding of what may be said, however, it will be necessary to present the facts, and state the main points of controversy as clearly, but briefly as possible. Dissenting opinions must be self-sustaining, as the facts are not entitled to be officially presented by an authorized reporter, and ordinary readers would hardly be likely to hunt them up for themselves, and hence the necessity for a statement of them in this opinion.

The complainants claim to be pew-holders, or renters, in the "First Reformed Dutch Church of the City and vicinity of Philadelphia," and bring their bills of complaint against the trustees of the church to restrain them, as appears by the second bill:—

"1. From dissolving the union formed in 1813 between this church in its corporative name and capacity, of the 'Evangelical Congregation of the City and vicinity of Philadelphia,' and the New Brunswick classis, an inferior church, judicatory of the Dutch Reformed Church in the United States; and that it may be decreed to be unlawful for the trustees of the said church to supply the pulpit of the church with a pastor, or to interfere with the exercise of that power by the consistory of the church.

"2. In the first bill, which for convenience I notice as the second, the prayer is to enjoin the trustees from applying the income, property and effects of the church in the inculcation or teaching of any other doctrine, faith or practice, than those contained in the Heidelberg Catechism, as expounded in its *Calvinistic interpretation;* being that given by the ecclesiastical assembly known as the Synod of Dort, which assembled at Dordrecht, in Holland, in the year 1618 and 1619, and from establishing in the pulpit of the said church as its pastor or teacher, any clergyman who is not of "sound doctrine" with reference to this standard of faith, and who is not regularly ordained as required by the *charter and fundamental articles* of said corporation; "and especially from installing in the pasto-

VOL. III.—22

[Sutter *v.* Dutch Church.]

rate of said church, the Rev. George W. Smiley, or applying the income or effects of said corporation for his maintenance, support or salary, as the minister of said church," &c.

These I think are the material matters embraced in the plaintiffs' two bills. Many things seem to be set forth in them by way of inducement, but being denied in the answers, and not proved by the complainants, they consequently go for nothing. Such, for instance, as that the said "First Reformed Dutch Church of the City and vicinity of Philadelphia was originally organized in 1809 ;" that it was the *design* and *purpose* of the fundamental law of the church, that the pastors should be *Calvinistic* and not *Arminian* in doctrine, and should be ordained by Christian denominations so holding ; that illegal votes had been given in the passage of the resolution dissolving the union with the classis, and the like.

These things were mostly unsustained by proof, and, where there was any testimony, disproved. The complainants' case gathers no strength from such allegations.

The learned judge of the Common Pleas overruled many points in the plaintiffs' bills as insufficient in law to entitle them to relief, but, on certain other grounds to be noticed, decreed in both cases in their favor, and hence these appeals by the trustees.

The members of the association which constituted this congregation and church, originally belonged to a congregation known as the "German Reformed Congregation in the City of Philadelphia," which was and still is in ecclesiastical connection with, and is a part of the German Reformed Church of the United States. Its declared standard of faith is the Bible and the Heidelberg Catechism. The withdrawal from the church took place in 1809, and all the testimony accords in proving that the separation was not schismatic, but only because the seceding members wished to have church service in English instead of German, as more profitable and suitable to the education and tastes of the youths belonging to them. Not being able to secure this in the old church, they accordingly withdrew and associated themselves as a congregation, under the name of the "Second Reformed Association." Thus certainly regarding the church they left as the same in faith, and to be considered the *first* German Reformed Church. They soon purchased a burial ground, procured a place to hold public worship, and organized formally as a congregation by the name of the "Evangelical Reformed Congregation of the City and vicinity of Philadelphia." By this name they were incorporated by the court in 1810, and to the trustees duly appointed under the charter, the title to the burial ground and church lot was conveyed in trust for the congregation. Fundamental articles for

the government and declaratory of a standard of faith of the congregation were adopted, and remain unchanged until this hour, excepting only in name. The temporalities of the church were committed to the trustees, and upon them also devolved the duty of calling or inviting candidates for the ministry when there was a vacancy; the eventual employment of whom depended on a vote of the congregation. By the Fundamental Articles the pastor was required to be of the "Reformed or Presbyterian denomination, regularly ordained, of sound doctrine, and unblemished character." And he "must preach the word of *God*, and doctrines of *Jesus Christ* according to the Prophets and the Apostles, and the precepts contained in the Heidelberg Catechism." Rules and Reg. Art. 1.

"The spiritual affairs of the congregation," according to Art. IV., "shall be under the government of the minister and seven elders, who shall form a session."

By Art. IX. of the charter it is declared that it shall not be construed to prevent the congregation from "uniting with *any* other Christian denomination *whenever* it shall appear to a majority of the members of said congregation to be for their advantage."

Under this charter and these fundamental articles the congregation remained for several years. It was their desire, and they made efforts, to procure a minister of the German Reformed denomination to preach to them in English, but were unsuccessful. They procured a clergyman of the Presbyterian, and after him, one or more ministers in succession of the Dutch Reformed denomination, to preach in English. The question was often agitated about a union with some other church judicatory, but never settled until in 1813, during the pastorate of the Rev. Dr. Brodhead, of the Reformed Dutch Church, when a union, or connection was formed with the classis of the Reformed Dutch Church of New Brunswick, New Jersey. This was brought about, doubtless, by the influence of this reverend gentleman, for before his time the project of union had always failed. In the provisional resolutions of the congregation, a declaration is made which indicates the presence of a very partial advocate for that peculiar church, for the act is put upon the ground that "from religious education and habits we (the congregation) are more closely connected with the Low Dutch Reformed Church than any other denomination." It is difficult to believe that this declaration was intended by the congregation to mean so much as is attributed to it now. That is to say, an expression of preference for the faith and practice of a church in which the members had not been trained and brought up, over one in which from infancy they had been accustomed to worship, as had their fathers before them. I

utterly discard this as evidence of a preference for the doctrines of the Heidelberg Catechism, as now contended for and claimed to have been understood by the congregation, although, perhaps, it may have been by the penman so designed. It must not be allowed the weight of a feather against the solemn declaration in the fundamental articles, and the known faith and practice of those who adopted them. They were German Reformed in sentiment, and their standard of faith was the Heidelberg Catechism, which it is proved, from many sources, is not essentially Calvinistic, and tolerates a diversity of belief on a subject which is a dogma of the Dutch Reformed Church, namely, the doctrine of a limited atonement.

In 1815 this step was followed by another. The name of the church was changed from the name by which it was originally incorporated, to the "First Reformed Dutch Church of the City and vicinity of Philadelphia." But, as already said, no change was attempted in the Fundamental Articles. They remained as originally declared, and I may as well say here, that by them the identity in faith and practice of the church is to be ascertained for all purposes of giving a proper direction to the trusts in its favor. Some incongruity in the forms of government took place after the connection arising from an admixture of those belonging to the Dutch Church with those provided for in the articles of incorporation of the church in question. Such as a change in the form of calling a minister; and the establishment of a consistory to take the place of the church session. These were acquiesced in, but they were sheer interpolations, for the articles of union did not provide for a single change in the machinery of government provided by the congregation for its own government. Indeed it is not claimed that the original articles were altered or modified in the least. Hence it is not improper to say that a government and practice not authorized, was usurpation. Of course, if this be so, these things furnish no proof of the faith of the church, but rather of a disposition to assent in silence to what was deemed immaterial in points of difference.

From 1815 until 1860 we hear of no difficulty in the church. About the last mentioned period a new church edifice was erected by the congregation, which had increased in strength and importance. A pastor was wanted, and was called by the trustees, in conformity with the articles on that subject, and elected by the congregation, and so recorded on the books of the consistory. The classis of the Dutch Church, in some way not disclosed, claimed the right to supervise the action of the trustees and congregation in these matters. They assembled and appointed a committee to call on the pastor to declare his faith, and to submit to an examination by the classis. The minister

[Sutter v. Dutch Church.]

elect declared his adherence to the standard of the congregation, but denied the dogma of the Dutch Church on the subject of a limited atonement as promulgated in the canons of the Synod of Dort, and refused to submit to discipline on this point by the classis. Whereupon the committee recommended the passage of a resolution by the classis, "that as the election was null and void on account of unsoundness of doctrines, that the consistory proceed to call a pastor in accordance with the rules and constitution of the Reformed Dutch Church, as though no call had been made upon the Rev. George W. Smiley." This resolution was unanimously adopted by the classis. After this action of the classis, the trustees called a congregational meeting in the church, to consider the question of dissolving the existing connection with that body. Immediate action thereon was prevented by an application for an injunction to restrain action in this matter. The special injunction, however, being refused, the congregation reassembled pursuant to adjournment, and on the 7th of February, 1861, did by a vote of seventy-five to sixty, declare their union with the classis of the Dutch Church dissolved and at an end.

The complainants now contend that this vote was ineffectual to dissolve the connection. That the whole number of the congregation entitled to vote was one hundred and sixty, and that a majority of that number, viz., eighty-one in the affirmative, was necessary to effectual action. On the other hand, it is insisted that it was a constitutional vote, there being a majority of the whole body present, and a clear majority of that number voting in the affirmative. The learned judge concurred in the views of the plaintiffs, and on the final hearing granted the injunction prayed, namely, to restrain the trustees of the congregation from interfering with the authority of the consistory "in the discharge of their offices and duties, which by the faith and practice of the Reformed Dutch denomination of Christians, or by the usage and practice of the First Reformed Dutch Church of the city and vicinity of Philadelphia, pertained to the consistory of said church, and especially in the office and duty of providing preachers," &c., and they be required to keep open the church and its pulpit for such clergymen as may be selected by the *consistory of said church.* In short, the decree covered the whole ground—determined against the dissolution of the connection—the right of the trustees to call a minister, and the eligibility of a minister so called and elected by the congregation.

The decree rests solely on the insufficiency of the vote of the congregation thus taken to dissolve the union. The rights by a constitutional vote to dissolve the union, was admitted by the learned judge. I am at a loss to comprehend how indeed

[Sutter *v.* Dutch Church.]

it could be denied. I do not understand that it is by the plaintiff's counsel. The union was formed by the act of competent parties. Each admitted the other to be so, by entering into and consummating the arrangement. The effect of the union did not *ipso facto* extinguish the distinct existence of either. They were separate bodies in union, for an agreed purpose. It was the compact that held them in union, and that dissolved, each remained as before. The article in the charter quoted, expresses this idea, by declaring it to be the right of the congregation to unite with *any* Christian denomination *whenever* it shall appear to be to their advantage. It regards them in union or otherwise, to be what the charter made them, a distinct corporate body. The argument that assimilates the exercise of this right to the execution of a power which becomes *functus* by execution, confounds plain distinctions. It was a declared right inhering in the corporation to be exercised like any other. Such right as exigencies or chance should require. No other limits are put upon it. It is utterly unlike the thing to which it is compared. The very nature of a power ordinarily, is to enable one to do something for another. When the act is performed, the power is exhausted, and the agent has no further authority. But the right of a corporation to act within its chartered power according to its discretion *whenever* its interests justify action, is a general right, and is not in the nature of a power. It is part and parcel of the franchise. But I need not elaborate this, for the following cases all recognize the right of dissolving ecclesiastical connections like this: *Com.* v. *Green*, 4 R. 531; *Johnson* v. *The Presbyterian Cong.*, 1 W. & S. 9; *Miller* v. *Gable*, 2 Denio, 533.

The right to dissolve being established, the remaining inquiry is whether it was constitutionally effected in this case. On this point, I think the learned judge erred.

There is a common law rule for the ascertainment of the sense of public bodies where no written rules exist. Where a deliberative body is composed of independent members, text writers and judicial authority unite in stating the rule to be, that the majority of those who attend after notice can effectually act; Angell & Ames on Corp. 501, 502, 505; Willcock on Municipal Corp. 66. To this effect is *Rex* v. *Whittaker*, 9 B. & C. 648. In *Gosling* v. *Veley*, 2 B. 457, a parish vote was to be held by church wardens, and the parishioners in vestry assembled; it was held that the church wardens could legally act in the premises if the parishioners did not attend, and if they did attend the majority would control. A congregation is a public body, composed of indefinite numbers, as much so as a municipal corporation, and should be governed by the same rules.

[Sutter *v.* Dutch Church.]

But even if it be claimed that this congregation is to be classed with corporations with definite numbers of shareholders, the rule is also clear; there the *majority of the whole* being assembled, the majority of the assembly is the controlling power. The maxim is "*ubi major pars, ibi totum,*" the absent being supposed to take sides and be included in the greater part. Grant on Corp. 68, 69, 70, and 155; Angell and Ames, 499; *Reg.* v. *Bailiffs of Ipswich,* 3 South, 155. In the case of *St. Mary's Church,* 7 S. & R. 517, Gibson, J., said that, "where no special provision is made by the charter, the whole are bound by the decision of the majority of the corporators present. So in substance is *Johnson* v. *Green,* and this was the rule of the Roman law; "*repertum ad universos quod publice fit per majorem partem.*"

The rule is one of necessity, and needs no authority to support it. The vote in this case was by a majority of the whole number assembled. This expressed the will of that assemblage as fully in law as if every member had voted in its favor, if there was no express rule requiring a different number. Was there any such rule?

When we turn to the charter, and the rules and regulations for the government of the congregation in search of such rule, none is to be found. And it is a significant fact, that whenever a greater number than a majority is required, in other cases it is provided for, and the occasion stated. The rules regulating the election of a minister, is that he must be chosen by "a majority of the votes of the qualified voters." On the dismissal of a minister, "*two-thirds* of the whole number" of the congregation must agree. "To alter any fundamental article, "two-thirds of the members present must coincide in the same."

Here we have three different rules applicable to three different occasions which may arise, but to no other. They are all special, none of them touch this vote, therefore, the rule of the common law must apply, for none other is provided; and whether the meeting be considered as of indefinite numbers, or that of a close corporation, the rule of the majority in either of the aspects above stated controls.

Art. IX. of the charter declares that the congregation has the power of uniting with any denomination of Christians *whenever* it shall appear to a *majority* of the members to be for their advantage. Supposing this to be a rule regulating the number necessary to vote *for* a union, it goes no further. It does not establish a rule to regulate the question of dissolution. It was wise to limit the power to carry the congregation out of its normal condition; for otherwise its faith might be subverted, and the church and the trust destroyed; and it was

[Sutter *v.* Dutch Church.]

equally wise to allow a greater facility of return to its original *status* as authorized and fixed by its fundamental laws. That condition would be presumed to be lawful, while its condition in a union might be doubtful. These were the reasons, I presume, for leaving the rule special, applicable only to action in one direction.

It is clear, therefore, I conceive, that no rule existed to require a greater vote to effect a constitutional dissolution of the connection between this congregation and the classis of the Dutch Church, than that which was given on the 7th February, 1861. It was a majority of the whole number present, who were a majority of the *whole* members of the congregation which was a lawful quorum. The court erred, therefore, in my opinion, in disregarding the common law rule when no other rule existed to govern the case, and in decreeing the act of dissolution of the date mentioned, as unconstitutional.

2. The decree in this, the first of these bills, will now be noticed. It enjoins the respondents from employing or applying the resources of the church to the support of any minister who shall teach any other doctrines of faith than is inculcated by the "Heidelberg Catechism, as the same is expounded in its *Calvinistic* interpretation, being the interpretation given to the same by the Synod of Dort," or any clergyman "not of sound doctrine with reference to said standard," and not regularly ordained as required by the charter and fundamental articles of the congregation, and especially from employing as pastor the Rev. George W. Smiley.

The faith of a religious body can only be passed upon by secular courts, when incidental to a question of property. When a society or church has acquired property, the law maintains the trust of it for the uses and purposes designed by the founders. To ascertain whether the trust is properly administered in accordance with this design, it often becomes necessary to inquire into the faith and practice of those claiming to control or to be beneficiaries. It is only in this aspect that temporal courts have jurisdiction to hear doctrinal points in theology discussed at all. It is only for the purpose of ascertaining the identity of the present use with the original dedication, that it is allowed. *Attorney General* v. *Pearson*, 3 Mer. 352; *Miller* v. *Gable*, 2 Denio, 492; *Presbyterian Church* v. *Johnston*, 1 W. & S. 9; *St. Mary's Church*, 7 S. & R. 517.

This line of authority brings judicially before us, it is supposed, a certain point of theological doctrine in the case in hand. The trust property here is held for the use of a congregation, whose fundamental articles require that its ministers "must preach the word of *God*, and the doctrines of *Jesus*

*Christ*, according to the Prophets and Apostles, and to the principles *contained in the Heidelberg Catechism.*"

Now I think it obvious that what is meant by this declaration is that the teaching must be according to the *general* doctrines of the standards; those essential doctrines which harmonize with the views of Protestant and Reformed denominations *generally*. The dedication is in a general sense, and if peculiar dogmas not *generally* received as elements in all Reformed Churches were intended, they should have been expressed or necessarily to be implied, or they cannot be recognized, for there is no rule by which to prove they were included in the laws. These fundamental articles were for an independent church, and union with any of different faith was not certainly contemplated. This being so, a subsequent union would not change the objects of the trust. I grant a different rule would hold had the trust been created with a view to the support of religion or doctrines in connection with some specified denomination. There the rule seems to be that the trust will be administered according to the tenets of the latter. But this was not the case here. Neither was the dogma declared to be essential in the original articles, nor was the connection necessarily to be with a church which held it; and here this rule of administration of the trust does not apply.

There was no such designation of a denomination for future association, and the congregation might have remained independent indefinitely, and then its tenets would be determinable only by its fundamental principles, as declared in its written testimonies and practices. Did its voluntary union with a judicatory of a distinct church organization change these fundamental principles? I think not, and I think it apparent that the object of this connection was for the purpose of Christian association, advice, and intervention in case of congregational dissensions in spiritual or doctrinal matters only. Government was not abdicated by the independent church, and by not one written line or word was it conceded to the Dutch Church. But even if that point were conceded, and government allowed to the classis, what was to be the power and principles of the government? I confidently answer that I think they were to be those established by the written articles of the church, and the practice growing out of the faith of its members. It cannot be seriously contended that it lost its distinctive character by the union. To hold this would be to assert that union was absorption, and that by the act the church which I denominate as the appellant became a *part* of the Dutch Church. As this is not claimed, then I hold that if all its characteristics were not changed by the union, none were. They were all equally vital, and if not all overwhelmed and

absorbed, I repeat, none can be claimed to have been. There was no written consent or protocol even to that effect. The original fundamental articles remained unchanged—the change of name, however, for whatever object designed, had no effect on the principles of the congregation. These must stand, and this controversy turns on them.

According to the rule already stated, we inquire, what were the principles of this congregation in its creation and incorporation? · By these the question must be determined whether there has been any, or there is about to be any diversion of the trust property in the employment of a minister professing the faith, and called according to the fundamental articles of the church, as has been the Rev. Mr. Smiley. Let who will determine this question—the synod or classis of the Dutch Church, the court below, or this court—it must be by the tenets of the church as founded, or by showing a clear change of fundamental principles.

On this point we may notice the fact before referred to, that the founders of this church were a portion of a German Reformed congregation, whose standard of faith was the Heidelberg Catechism, to whom had been preached its doctrines, independently of and against the dogmas of a "limited atonement," as held by the Dutch Church. The testimony of Rev. Dr. Helfenstein, now eighty-six years old, and the pastor of the German Reformed Church at the time of the secession, proves this; so does Henry Jordan, one of the founders and original contributors to the church out of which this controversy has arisen; so also do Mr. Offerman and Mr. Benner. These ancient witnesses all belonged to the present church, and three of them assisted in founding the new. These witnesses prove the faith and practice of the present church. That in the Heidelberg Catechism were taught the doctrines of free grace and unlimited atonement. Not one word of testimony was given by the complainants to disprove this. I have already said, and the proof shows it, that the separation was not about any difference in doctrine, but only because those who left wanted the doctrines of their church taught in English for the benefit of their children.

That the new congregation had no intention of changing its former doctrines of faith, is also apparent in the fact, that the name they assumed before complete organization as a church, was the "*Second* Reformed Association:" *second* to what? Certainly to the parent church which they deferred to as first in that series in Philadelphia. Again, when incorporated, they adopted as their corporation name, "The Evangelical Reformed Congregation of the City and vicinity of Philadelphia." This name was consistent with an agreement in doctrine with the

parent stock; of itself, however, this only amounts to a nega-
tive of any idea of a departure in doctrine.    But what is more
to the point and decisive, I think, on the question of present
consistency of the church with doctrines of the church as
founded, are the fundamental articles of the church originally
adopted and never altered.

These adopt the Heidelberg Catechism as a true exposition
of Scripture, and as the standard of faith to be taught by their
ministers, and to be subscribed to by the elders, who with the
minister, have the spiritual concern of the congregation in charge
as a church session.    Witnesses, writers and judicial decisions
concur in saying, that in this form, and without the doctrine of
a limited atonement being considered an element, is the Heidel-
berg Catechism accepted as the standard of faith of the German
Reformed Church.    Testimony of Rev. *Albert Helfenstein*, ser-
mon of Rev. Dr. Bomberger, of German Reformed Church in
Race Street, 1860.    (The Old Paths, by J. F. Berg, 1845.)    *Miller*
v. *Gable*, 2 Den. 492, Errors and Appeal, New York.

This Catechism, it thus appears, admits diversity of belief on
minor points of faith.    "The main design of framing it," says
Dr. J. F. Berg (The Old Paths, 1845), "was to present the
*great truths* of the Christian faith in such a manner that *all
really evangelical minds* might harmonize in the statement.    It
is believed that it can be rejected by none, excepting those
who repudiate the *essentials* of Christianity."    This is a truth-
ful presentation, I think, and may stand for the substance of
what numberless preachers and writers have said in regard to
it.    Now it is evident that if a purely German Reformed
Church had by fundamental articles declared the Heidelberg
Catechism as their standard of faith, the dogma in question
would not have thereby been necessarily or essentially any por-
tion of the standard.    Reasonable minds, in view of the practice
of this church, will concede this.    Who were they that founded
this church in question, and declared the standard?    They were
members of a German Reformed Church, brought up in its
faith and practice, and although they separated from the parent
church, they did not separate from its faith.    We are to find
the objects of a trust in the faith and principles of the society
for which it was created, says *Attorney General* v. *Pearson*, and
*The Presbyterian Church* v. *Johnston* (sup.).    We have it proved
and ascertained here as clearly as a fact was ever proved, that
the members of the original association and congregation were
German Reformed.    We must desert settled law, else interpret
the language of the fundamental articles in the light of the
faith of those establishing them, and that was in the German
Reformed view of the standards.    If that, then, was its origin,
it is no diversion of the trust funds to continue the propaga-

[Sutter *v.* Dutch Church.]

tion of the faith of its founders. The presumption that they founded their church in their own faith and practice, and that their language means that, nothing but the clearest evidence of renunciation or alteration should be allowed to overthrow. It requires clear and unambiguous words, and by a man clearly competent to make a will, before we can believe that he means to disinherit those for whom he ever labored and always loved. So in matters of faith, conscientious men adhere as firmly to tenets believed to be truths, as they do to their natural affinities. The evidence must be clear to induce a belief of an entire change in either case.

The Vice Chancellor, Hoffman, whose opinion was affirmed in the Court of Errors and Appeals, in *Miller* v. *Gable* (sup.), agrees with our case exactly. He says: "Here, then, is the only standard (the Heidelberg Catechism), to which the doctrines of the church is referred—by which the adherence of a pastor and a congregation is to be judged; and I find all the pastors, whose admission is considered an intrusion, teaching this catechism. If they teach it with an Arminian construction, I cannot interfere. It is not established that the property was to be held for *those otherwise interpreting it*." Neither in the faith nor practice of the founder of this church, nor in the words which they use to declare its standard, is there a syllable fairly construed which proves the position of the complainants, that the dogma of the Synod of Dort was to control the interpretation of the catechism. Inherently it does not. The catechism itself, history informs us, was the work of divines holding diverse views in regard to the atonement. Frederick III., Elector of the Lower Protectorate, caused it to be written, and its principal contributors were Zacharius Ursinius, a disciple, I believe, of Melancthon, and Caspar Oliveanus, of Calvin, while the elector himself was known as a Philipist. Dr. Mayer, in his History of Religious Denominations in the United States, p. 344, points to this fact, as the reason why the doctrine of a limited atonement as taught by Calvin, and forty-four years after the promulgation of the Catechism, was announced as a canon of the Low Dutch Reformed Church of the Synod of Dort, is not considered an essential element of faith by those whose standard is the Heidelberg Catechism. This being the proof by the witnesses, writers, and historians, we are to regard it as clear that the Heidelberg Catechism is a standard of faith for those of the German Reformed denomination, or any others who adopt it generally, and without qualification—without obligation to believe in the Calvinistic or Arminian view of this mysterious and utterly unsoluble question by human capacity. I therefore adopt the conclusion of the Vice Chancellor in *Miller* v. *Gable:* "I find it (the Catechism) susceptible

of an Arminian construction. If it never receives such construction, I am not able to say that the will and intents of the founders are thereby violated," and I can cordially agree with Gardiner, President of the Court of Errors and Appeals, in the same case, that if any class of Christians believe that spiritual blessings flow only in a particular channel, they should clearly and explicitly make it appear before others shall be compelled to accord in that belief; if not, conscience and rights of conscience may be infringed upon, and rights of property be jeoparded. The majority of this congregation will be in this category if this decree be affirmed. They must either sit under the teachings of a doctrine not agreeable, as they think, to their Christian standard of faith, or go hence and seek a more congenial association elsewhere. They ask only that, on this point, the Calvinistic interpretation of the Catechism be omitted. That its more enlarged and beneficent doctrines of salvation be taught, leaving individuals the freedom of conscience on peculiar dogmas untrammelled. I say peculiar, because the doctrine in question is very far from being unchallenged in the Christian church in its largest sense, or in its Reformed and Protestant sense. I am in no wise competent to express any opinion of its Scriptural character, and as a judge of a civil judicatory it does not become me to do so, but I may say that, in the present age of the world, it is not, I think, a fundamental article of faith in anything like a majority of the Protestant churches. It is, therefore, the more improbable that the church here intended it should be an article of faith with them.

It is a settled principle that the doctrine of the founders of a religious trust will control it. When that principle is to be yielded, if it is to be, then it will become more common than ever hitherto, to divert trusts, and carry off bodily, congregations and churches from their original faith. A fraternal connection for the purpose of Christian association and advice between distinct but not altogether incongruous bodies, an assimilation in name, but in nothing else, may be sufficient as a general rule for such purpose; but when the wrong is disclosed, it will be no less a wrong because it may have been accomplished by very gentle means. I think the controlling majority of this church will belong to this predicate, if these decrees stand. It will be a vain effort to procure a dissolution of the connection, if it must be accomplished as required by the decision below. New members, absentees, and those otherwise opposed, will pretty certainly defeat the required majority.

I am of opinion, therefore, that the classis have no jurisdiction to declare the election of Rev. George W. Smiley null and void, and direct "the consistory to call a pastor in accordance

[Sutter *v.* Dutch Church.]

with the rules and constitution of the Reformed Dutch Church, as though no call had been made upon Rev. George W. Smiley." —*Res. of Classis.*

*Because* the Rev. George W. Smiley had been, and was, called and elected by the church, in accordance with its fundamental articles, which have never been changed or altered; and *because* the Rev. George W. Smiley did believe in, and proposed to teach, the Heidelberg Catechism, which was the standard of faith declared by the church; and further *because*, it was not attempted to be proved that he proposed to teach it in a sectarian, or in any but its general Christian sense; the only proof being that he refused to teach it in accordance with the canons of the Synod of Dort, he was, I think, exactly within the only standard of the church which called him in all these particulars. This decree of the court below affirms the action of the classis, and thus, in my judgment, is the trust completely diverted from its original purpose. It has not been shown that the fundamental articles of this church have been abrogated, altered, or have ceased in faith and practice to be the exponents of the sentiments of the congregation; if this be not so, then why are not proceedings in accordance therewith constitutional? And, if constitutional, where is the authority to overrule them? Having no constitutional authority to do it, the exercise is essentially despotic. These articles not only provide for a call by the trustees, and an election by the congregation of a minister, but for his dismissal by an act of the congregation; I cannot comprehend, therefore, the right or necessity for interference by the court, unless it were clearly shown that the minister employed was so employed in direct violation of the church rules so employing him, which has not been done here.

The willingness on the part of the minister elect in this case to teach the Heidelberg Catechism in its general sense (and there is neither complaint nor proof to the contrary, except his refusal to deliver it in a Calvinistic sense, which does not prove a determination to preach it in an unscriptural sense), is exactly the sense in which we as judges are to judge of it. Its general Christian sense. In *The King* v. *Woolston*, 2 Str. 837 (which was an indictment for blasphemy, in denying the miracles of our Saviour), there the court would not suffer it to be doubted, whether to write against Christianity *in general* was not an indictable offence, and punishable in the temporal courts. But "they desired, however, that it might be taken notice that they laid the stress on the word *general*, and did not include disputes among learned men upon controverted points." Lord C. J. Raymond, in Fitzgibbon's Rep. of the same case, p. 64, said: "We do not meddle with any difference of opinion, and

[Hays et al. *v.* Kennedy et al.]

we interfere only when the very root of Christianity itself is struck at, as it plainly is by this allegorical scheme. The New Testament and the whole relation of the life and miracles of *Christ* being denied."

I think this should be our rule; otherwise, we are thrown into the contests of the schoolmen as to what doctrines are or are not explained in a proposed system. It is out of supposed implied doctrines the controversy here arises. It is not expressed in the Catechism, nor in the fundamental articles which expound the trust, and it is not among a large portion of the Christian world a doctrine of the Bible. It is a disputed point, and we should not say that it is an essential element in the faith of this church when it is not so expressed, and standing as it has ever stood, and will ever stand, a rock in the ocean of polemics, far beyond the reach of man to comprehend—to prove or disprove.

I would for these and many other reasons themselves apparent, reverse the decrees in both these cases.