DANIEL DODD, appellant,

*v.*

WILLIAM UNA et al., respondents.

1. A savings institution, by its charter and the supplements thereto, had power to receive deposits and invest them in any of certain specified securities, and was required to return deposits to depositors on terms to be prescribed by the managers. Such terms were prescribed. On December 12th, 1877, the institution presented a petition to the court of chancery, showing its powers and duties; its acceptance of deposits on the prescribed terms and the investment of a large amount thereof in securities which had depreciated; the withdrawal and expected withdrawal of deposits, averring that, in case of such withdrawal, it was doubtful whether loss to the depositors might not result, and praying, among other things, that the institution should be ordered not to pay deposits to depositors, except as directed by the court, and that the institution should be ordered to invest future deposits in securities to be specified by the court, and to keep such deposits and the accounts thereof separate from the previous deposits. Appended to the petition was a written paper signed by the managers, signifying their concurrence in the petition, and requesting its presentation to the court. No other persons were parties. On the same day, an order was made in accordance with the prayers, and particularly specifying the securities in which future deposits were ordered to be made. Afterwards certain persons presented a petition to that court, setting out the previous proceedings, averring that they were depositors, and that the managers had violated the order of the court by investing deposits in other securities than such as were specified in the order, and praying that if, upon inquiry, they should be found to have so violated the order, they should be adjudged guilty of contempt, and punished. Answers were filed, and on the issue thus made up, and testimony taken thereon, an order was made adjudging one of the managers to have violated the order, and so to be guilty of contempt. This order was appealed from.—*Held,*

(1) That jurisdiction of the court of chancery to make the order of December 12th, 1877, might be questioned in the proceedings taken in that court to punish appellant for disobedience of that order, and on an appeal from the order adjudging him guilty of such disobedience and in contempt.

(2) That no jurisdiction to make the order of December 12th, 1877, then existed in the court of chancery.

(3) That appellant is not debarred from questioning the jurisdiction by reason of his conduct in respect to the petition filed by the institution.

Dodd v. Una.

2. There is a distinction between proceedings for contempt taken by the court itself for the punishment of persons guilty of contemptuous conduct derogatory to the authority or the dignity of the court, and the same proceedings, when instituted at the instance of third persons, for the disregard of orders of the court made for their benefit. In proceedings of the first class, if the court, in its constitution, has power to punish for contempt, its decision is final and conclusive and cannot be reversed on appeal. In proceedings of the second class, an appeal will lie, and the validity of the order adjudging the contempt will depend on the validity of the original order, on the disobedience of which the contempt was adjudged.—*Per* DEPUE, VAN SYCKEL and REED, JJ.

On appeal from an order advised by Vice-Chancellor Van Fleet, whose opinion is reported in *Una* v. *Dodd, 12 Stew. Eq. 173.*

By an act of the legislature approved February 25th, 1847, the Newark Savings Institution was incorporated. The act contained the following:

"Sec. 4. And be it enacted, that the said corporation may receive, as deposits, all sums of money which may be offered for the purpose of being invested, in such sums, and at such times, and on such terms as the by-laws shall prescribe, which shall be invested accordingly, and shall be repaid to such depositor at such times, and with such interest, and under such regulations as the board of managers shall, from time to time, prescribe.

"Sec. 5. And be it enacted, that it shall be the duty of the managers to regulate the rate of interest to be allowed to the depositors, so that they shall receive a ratable proportion, as near as may be, of the profits, after deducting therefrom all necessary expenses, and a reasonable surplus or contingent fund.

"Sec. 6. And be it enacted, that no emolument whatever shall, directly or indirectly, be received by the president or managers for their services.

"Sec. 7. And be it enacted, that the said corporation shall invest no money in any other public stocks than such as are created under the laws of the United States, or of this state, nor on bonds and mortgages, except on unencumbered real estate, worth at least double the amount of the sum invested, nor in the stock or loans of any incorporated company whatever."

A supplement, approved March 5th, 1850, enacted, among other things, as follows:

"Sec. 2. And be it enacted, that the said corporation, in addition to the power of investing money in public stock, given in the seventh section of the act to which this is a supplement, may invest money in the public stocks of the states of New York, Ohio, Kentucky and Massachusetts, authorized by the

43

Dodd v. Una.

respective laws of said states, and also in the stocks of the city of Newark, in this state, and of the cities of New York and Brooklyn, in the state of New York, authorized by the laws of said states respectively."

A supplement, approved February 9th, 1859, repealed so much of the sixth section of the act as prohibited compensation to managers for actual services, and gave power to invest in the stocks and bonds of states, and in the bonds of counties and cities, and to make temporary loans on personal securities, with collateral securities.

By-laws were adopted, which regulated the mode whereby depositors could demand and withdraw their deposits, and, in particular, provided that no deposit should be withdrawn at any time without three months' notice to the institution, and each depositor was required to subscribe the by-laws, and thereby signify an assent thereto.

On December 12th, 1877, the institution presented a petition to the chancellor, in which was alleged its incorporation and the powers conferred and duties imposed thereby; that it had organized in 1847, had received and invested deposits to a very large amount, and had, at one time, accumulated a large surplus; that its managers had invested between $2,000,000 and $3,000,000 in railroad bonds and loans secured by such bonds; that from 1873 the assets had so depreciated that the question whether any of the surplus would remain would depend on the ultimate value of its railroad securities and its ability to realize on mortgages affected by a fall in the value of real estate; that deposits had been largely withdrawn, and increasing withdrawals were expected unless the ninety-day notice clause of the by-laws should be enforced; that its enforcement would work greater distrust, and impair, if not wholly destroy, the usefulness of the institution; that although it had available securities, from the proceeds of which such withdrawn deposits could be paid for a long time, yet its managers were advised and believed that they could not allow such a course to be pursued without violating their duties as trustees for all the depositors; that they believed that, by a careful management of their trust under the direction of the court, the existence and usefulness of the institution could be

maintained, and its depositors secured from ultimate loss; that they regarded the institution as an incorporated agency for receiving and loaning money entrusted to it, and themselves as trustees of the depositors; that the assets on hand at any time were the property of depositors, in proportion to their deposits, each depositor's right being diminished by losses or increased by gains in investments; that they were unwilling to proceed in the execution of their trust without the sanction and direction of the court of chancery in its jurisdiction over the administration of public and private trusts, being satisfied that, without such direction, they could not maintain the institution in public confidence, or secure absolute equality among the owners of its assets.

The prayers of the petition were as follows:

" 1. That an order may be made requiring that only such dividend shall be paid to depositors on the first day of January next as shall be authorized by the order of the court.

" 2. That an order may be made restraining the institution from paying to any depositor, and any depositor from demanding, more than eighteen per cent. of his deposit until the further order of the court, which amount may be required and paid at any time thereafter on demand.

" 3. That this institution be required by the order of the court to abstain from disposing of any of its assets beyond the said eighteen per cent., except with the approval of the court, or some master to be designated for that purpose.

" 4. That an order may be made permitting the said institution to provide that all deposits hereafter made, and until further order of the court, shall be treated as special deposits, and invested only in the bonds of this state or city of Newark, or of the United States, and that separate accounts thereof be kept, and the actual interest received from such investments, deducting necessary expenses, be paid as dividends on such deposits, and that such deposits shall not be subject to any restrictions as to payment except such as are imposed by the by-laws heretofore adopted.

" 5. That the future administration of the said trust shall be under the control of the court so long as shall be deemed necessary to promote the interests and insure the permanency and prosperity of the institution.

" 6. That concurrently therewith this honorable court will cause such examination to be made into the affairs of said institution, and the situation and nature of its assets, as your Honor may deem necessary as a basis for the future action of the court."

There was no prayer for process.

Dodd v. Una.

The petition was sworn to by appellant, and appended thereto was the following:

"We, the undersigned, managers of the Newark Savings Institution, hereby signify our concurrence in the above petition, and request its immediate presentation to the chancellor."

Which was signed by the managers.

On the presentation of the petition the following order was made:

"Upon reading and filing the petition of the Newark Savings Institution, setting forth the situation and character of the securities in which the moneys deposited for investment under the provisions of its charter have been invested, and praying for the direction of this court in the administration of its trust, in order to secure absolute equality among the depositors, and promote the permanency and usefulness of the institution for the causes set forth in said petition;

"And the court having fully considered the matters set forth in said petition, and being of opinion that the said institution is a public trustee of the funds in its hands belonging to its depositors, and that the administration thereof is under the control of this court, and that the facts set forth in said petition justify the exercise of such control in order to secure equality in the distribution and payment of said funds, and to enable the managers to administer their trust in such manner as, if practicable, to secure the depositors against ultimate loss, and promote the permanency and efficiency of the institution;

"And it further appearing to the satisfaction of the chancellor that the said institution will have received at the close of this year for interest on its investments during the last six months an amount more than sufficient to enable it to pay an interest of two per cent. on the deposits for the said term, and that it has on hand in cash, or its equivalent in United States bonds, sufficient to pay on demand eighteen per cent. of its deposits:

"It is thereupon, on the twelfth day of December, eighteen hundred and seventy-seven, ordered by the chancellor that the said institution be authorized to credit and pay on and after the second day of January next, an interest or dividend of two per cent. out of its earnings for the past six months, on such deposits as shall be then entitled to receive the same; that from and after the service of a copy of this order, the Newark Savings Institution do refrain from paying to any depositor any sums which in the aggregate shall exceed eighteen per centum of the amount of the deposit standing to the credit of such depositor at the close of the eleventh day of December, eighteen hundred and seventy-seven, until the further order of this court.

That the said institution shall hereafter, and until the further order of the court, refrain from making any disposition of its assets except the payments to

Dodd *v.* Una.

depositors above mentioned, and its ordinary taxes and expenses, without the approval and order of the court.

"That all deposits in said institution made on or after the twelfth day of December, eighteen hundred and seventy-seven, and until the further order of the court, shall be treated as special deposits, and invested only in the bonds of this state, the city of Newark, or the United States, and that separate accounts thereof be kept, and the actual interest received thereon, deducting necessary expenses and taxes, be paid as dividends upon such special deposits; and that such deposits shall not be subject to any of the restrictions hereby imposed."

On June 12th, 1880, another order was made permitting a portion of investments on mortgages of real estate.

On June 10th, 1884, a petition was presented to the court of chancery, entitled in the above matter, by William Una and others (the respondents), which represented that petitioners were depositors in the institution, and set out the above-mentioned proceedings, and then charged that certain persons, managers of the institution, had violated the above-mentioned orders by investing deposits in securities other than those therein specified. The petition prayed an inquiry into the conduct of the managers in that respect, and that if they should be found to have violated the orders, they should be adjudged in contempt and punished accordingly. The petition was signed by counsel and answers thereto were filed by the managers.

Afterwards, on January 5th, 1885, an order was made thereon, adjudging Daniel Dodd (the appellant) guilty of contempt in that respect, and directing him to appear to receive the judgment of the court as to the punishment to be awarded to him therefor. The appeal is from the last-mentioned order.

*Mr. B. Williamson, Mr. Thos. N. McCarter* and *Mr. John R. Emery,* for appellant.

I. Upon this appeal from a decree of the court of chancery, adjudging the appellant guilty of contempt of court, the question of the propriety of the adjudication upon the facts of the case is reviewable, and this court is not restricted to the question of the jurisdiction of the court below to pronounce the decree.

See *Rev. p. 125 "Chancery"* § *114,* providing that "all persons

aggrieved by any order or decree of the court of chancery may appeal from the same, or any part thereof, to the court of errors and appeals."

Such orders (adjudging contempts) are appealable and reviewable on the merits under the English chancery practice.

See *Witt* v. *Corcoran, L. R. (2 Ch. Div.) 69* (court of appeal, 1873), where it was held that an appeal lies from an adjudication of contempt, although the appellant was only ordered to pay costs, and under the judicature act there was no appeal on a decree for costs alone.

Also *Jarman* v. *Chatterton, L. R. (20 Ch. Div.) 493* (court of appeal, 1882), where it was held that an appeal also lies from a refusal to commit for contempt (as well as from an adjudication of contempt), under the well-known practice of the court.

The same view is intimated in *Ball* v. *Street, 9 Johns. 443* (New York court of errors, 1812), under a statute relating to appeals similar to ours. See *Yates, J., p. 448, Kent, C. J., p. 448.* (The appeal in this case was held to be premature because no adjudication of contempt had been made).

The cases in this court bearing on the question have not restricted the operation of the statute.

In *Coryell* v. *Holcombe, 1 Stock. 650* (court of errors and appeals, 1854), it was held that there was no appeal from an order directing parties to be brought in to answer for contempt, because they were not aggrieved by such order.

II. The proceedings in this case were not instituted for the purpose of enforcing obedience to a decree, but are professedly taken for the sole purpose of vindicating the dignity of the court. Such proceedings cannot be instituted by mere volunteers and persons not parties to the suit in which the order alleged to have been violated was made.

III. The petitioners in this matter have no standing in the court to prosecute the alleged contempt, and the court had therefore no jurisdiction over the proceedings for contempt or to pronounce the decree.

Dodd *v.* Una.

IV. If the court had no jurisdiction to make the orders adjudged to have been violated, they were *coram non judice* and void. No legal obligation was imposed on the appellant by them, and he cannot be adjudged guilty of contempt for disobedience of them. *Jochumsen* v. *Suffolk Savings Bank, 3 Allen 87 ; People* v. *Sturtevant, 9 N. Y. 266 ; Munday* v. *Vail, 5 Vr.. 418 ; Wilcox* v. *Jackson, 13 Pet. 511 ; Ex parte Fisk, 113 U. S. 713.*

V. The court of chancery had no jurisdiction to make the orders in question. It is not within the ordinary jurisdiction of a court of chancery to interfere with the internal affairs of a corporation. *2 High on Inj.* § *1189 ; 1 Pom. Eq. p. 155* § *171 ; Einstein* v. *Rosenfeld, 11 Stew. Eq. 310 ; Attorney-General* v. *Utica Ins. Co., 2 Johns. Ch. 371 ; Hodges* v. *New England Screw Co., 1 R. I. 351 ; Folger* v. *Columbia Ins. Co., 99 Mass. 267 ; Waterbury* v. *Merchants Union Express Co., 50 Barb. 157.*

VI. The Newark Savings Institution is not a trustee of a public trust in such manner as to give the court of chancery jurisdiction over its management as a charity. *1 Pom. Eq.* § *154 ; Adams's Eq. 65 ; 1 Spence's Eq. Jur. 587, 588 ; Attorney-General* v. *Aspinwall, 2 My. & Cr. 618 ; White* v. *White, 1 Bro. C. C. 14 ; Perry on Trusts* §§ *22, 687 ; Jackson* v. *Phillips, 14 Allen 555 ; Winfield's Adjudged Words and Phrases 100 ; Attorney-General* v. *Heelis, 2 Sim. & Stu. 76 ; S. C., 2 Swanst. 297 ; Attorney-General* v. *Brown, 1 Swanst. 297 ; S. C., 1 Stuart 265 ; Attorney-General* v. *Corporation of Carmarthen, 10 Eng. Ch. 30 ; Mayor &c.* v. *Lowten, 1 Ves. & B. 245 ; Attorney-General* v. *Moore, 4 C. E. Gr. 503 ; 2 Story's Eq.* § *1191 ; Van Houten* v. *First Reformed Church, 2 C. E. Gr. 132 ; McCahill* v. *Equitable Asso. Soc., 11 C. E. Gr. 538 ; Munday* v. *Vail, 5 Vr. 418 ; Rhode Island* v. *Massachusetts, 12 Pet. 718.*

VII. The relation subsisting between a savings bank and its depositors is not that of trustee and *cestui que trust,* but of debtor and creditor by virtue of the contract between them.

*People* v. *Mechanics and Traders Savings Inst., 92 N. Y. 7;
Van Dyck* v. *McQuaide, 86 N. Y. 47; Macini* v. *Savings Inst.,
23 Me. 350; Lund* v. *Seamans Savings Bank, 37 Barb. 129;
Allen* v. *Williamsburgh Savings Bank, 69 N. Y. 314; In the
matter of Franklin Bank, 1 Paige 249; Chapman* v. *White, 6
N. Y. 412; Graves* v. *Dudley, 20 N. Y. 74; In re Bank of
Madison, 5 Biss. 515; Shonewald* v. *Metropolitan Savings
Bank, 57 N. Y. 418; Eves* v. *Peoples Savings Bank, 27 Conn.
229; Lewin on Trusts 653; Jochumsen* v. *Suffolk Savings
Bank, 3 Allen 87.*

VIII. If this savings bank shall be held to be a public or
charitable trust, the power of the court of chancery over such
bodies does not extend to a repeal or alteration, of its charter, or
to deprive the lawful by-laws of their binding force. *Lewin on
Trusts 400; Attorney-General* v. *Whitely, 11 Ves. 241, 251;
Attorney-General* v. *Earl of Mansfield, 2 Russ. 20; Attorney-
General* v. *Moore, 4 C. E. Gr. 503; Van Houten* v. *First Ref.
Church, 2 C. E. Gr. 132.*

IX. This case does not present such questions of doubt or diffi-
culty as will justify the direction given to these managers on that
ground. *Attorney-General* v. *Moore, supra; Van Ness* v. *Jaco-
bus, 2 C. E. Gr. 154; Kearney* v. *McComb, 1 C. E. Gr. 193;
Merlin* v. *Blagrade, 25 Beav. 139; Morice* v. *Bank of England,
Cas. Temp. Talb. 224.*

X. Appellant is not estopped from raising the question of
jurisdiction by the fact that he joined in or sanctioned the appli-
cation in pursuance of which the orders were made. *Mordecai*
v. *Lindsley, 19 How. 199; Montgomery* v. *Anderson, 21 Id.
386; Ballae* v. *Forsyth, 21 Id. 389; Jackson* v. *Ashton, 8 Pet.
148; Heriot* v. *Davis, 2 Wood. & M. 230; United States* v.
*New Bedford Bridge Co., 1 Id. 406; Coffin* v. *Tracey, 3 Cai.
129; Heyer* v. *Burger, Hoff. Ch. 1; Dudley* v. *Mahew, 3 N.
Y. 10; Beach* v. *Nixon, 9 Id. 35; Hart* v. *Granger, 1 Conn.
169; Greenway* v. *Dare, 1 Hal. 305; State* v. *Conover, 2 Id.
218; Cottrell* ads. *Den, 3 Gr. 344; School Trustees* v. *Stocker,
13 Vr. 116; Tompkins* v. *Schomp, 16 Vr. 461; Trustees* v.

Dodd v. Una.

*Wilkinson, 9 Stew. Eq. 143; Ryno v. Ryno, 12 C. E. Gr. 525; Pruden v. Lindsley, 1 Stew. Eq. 378; S. C. on appeal, 2 Id. 615.*

XI. The transactions which the vice-chancellor found to be violations of the chancellor's order were not investments but temporary loans on collateral. The distinction between investments and temporary loans on collateral in the transactions of savings banks, is recognized by legislative decisions. *Charter § 7; Supplement 1850 § 2; Supplement of February 9th, 1859 § 4; P. L. of 1878 p. 393 §§ 1, 2; P. L. of 1883 p. 132; General Savings Bank Law (Rev. p. 1058 &c.) § 27; Charter Howard Savings Inst., P. L. of 1857 p. 219; Supplement to do., 1864, P. L. p. 18 § 7; Paterson Savings Inst., P. L. of 1869 p. 1265 § 6; Dime Savings Inst., P. L. of 1864 p. 192; Supplement of 1867, P. L. p. 349; Central Savings Inst. of Jersey City, P. L. of 1871 p. 199 § 7; National Trust Co. v. Murphy, 3 Stew. Eq. 408.*

XII. If the order alleged to have been violated is ambiguous in its terms, so that men may fairly differ as to its construction, appellant, if he has technically violated the order, is entitled to the presumption of innocence. *United States v. Atchison, Topeka and Santa Fe Ry. Co., 16 Fed. Rep. 853; State v. Trumbull, 1 South. 139; Maginnis v. Parkhurst, 3 Gr. Ch. 433; Fraas v. Barlement, 10 C. E. Gr. 84.*

XIII. The loan to Fisk & Hatch of $1,700,000 in January, 1883, which is declared to be a violation of the order, was made upon the security of government bonds.

XIV. The fact that the securities were to be left with Fisk & Hatch for convenience of exchange did not make the loan a loan without security.

A chattel mortgage upon a running stock of goods has the same elements, viz., (1) a security for a loan; (2) the security is left in the hands of the borrower; (3) the borrower has the privilege of exchanging the security by sale &c. Such mortgages are securities. See *Lister v. Simpson, 11 Stew. Eq. 438 and cases cited,* Vice-Chancellor Van Fleet holding that the

mortgage is good not only between parties but as against credi-- tors, unless proved to be fraudulent.

XV. All the evidence in the case shows clearly that in leaving the securities for the loan with Fisk & Hatch, the appellant believed the loan was secured as directed by the order, and that there was clearly no intention of violating either the letter or spirit of the order. Indeed, it may fairly be claimed that leaving the securities for convenience of exchange, was neither unreasonable nor unusual.

XVI. The appellant should not be adjudged guilty of contempt except for a willful violation of the order, and if he in good faith believed the loan in question to Fisk & Hatch to have been secured by government bonds, the decree as to this point should be reversed.

The question in these proceedings, which are criminal and altogether punitive in their character, is not as to negligence or mistake in judgment which might subject to civil liability in damages, but relates only to the existence of an intention to violate the orders and contemn the authority of the court.

XVII. The vice-chancellor erred in both the opinion and the decree in declaring that the $845,000 in the hands of Fisk & Hatch at the time of their failure (May 15th, 1884), was a portion of the money loaned under the letter of January 29th, 1883. It appears conclusively by the evidence that the loan of $1,700,-000 was paid off in the spring of 1883, and the "loan account" closed, and that the money in the hands of Fisk & Hatch at the time of their failure, was money derived from bonds sold or called in by the government, and merely remained temporarily in their hands awaiting investment.

*Mr. Samuel Kalisch,* for respondent.

DIVISION I. The first point which presents itself for adjudication by this tribunal is whether the original proceeding, in which the orders alleged to have been violated by the appellant were made, was one in which the court had jurisdiction.

Division II. If the court of chancery had jurisdiction in the original proceeding, its adjudication in that proceeding against the appellant is final and not reviewable.

Division III. If the court of chancery had jurisdiction in the original proceeding, and the proceedings against the appellant are reviewable by this tribunal, then it will be respectfully insisted that the facts adduced in the proceedings against the appellant, prove him guilty of a willful contempt.

Division I.—The original proceeding was one in which the court of chancery had jurisdiction.

To maintain this proposition, it becomes necessary to inquire whether all the elements which constitute jurisdiction were present. This will lead to a short inquiry into what jurisdiction is.

After having ascertained what is meant by jurisdiction, it will be important to know whether the court of chancery possessed jurisdiction within the legal meaning of the same, by considering—

(a) The subject-matter of the original proceeding.

(b) The legal *status* of the parties in the original proceeding.

(c) The jurisdiction of the court of chancery over the subject-matter and parties in the original proceeding.

(d) The special facts upon which the court of chancery founded and exercised jurisdiction.

As to the general inquiry, What is jurisdiction? *Combe* v. *Edwards, L. R. (3 Prob. & Div.) 103; State* v. *Gedicke, N. J. L. J., 1879, 54; Cooper* v. *Reynolds, 10 Wall. 316; Ex parte Watkins, 3 Pet. 193; Harvey* v. *Tyler, 2 Wall. 338; Kemp's Lessees* v. *Kennedy, 5 Cranch 173; State of Rhode Island* v. *State of Massachusetts, 12 Pet. 718; Grignon's Lessees* v. *Astor, 2 How. (U. S.) 338; Munday* v. *Vail, 5 Vr. 422.*

(a) The subject-matter of the original proceeding.

The Newark Savings Institution was the subject-matter of the original proceeding. Properly organized and conducted, a savings bank is a *quasi* charitable and purely benevolent institution. *Hannon* v. *Williams, 7 Stew. Eq. 258; In re Newark*

*Savings Inst.*, 1 *Stew. Eq. 554, 555; Stockton* v. *Mechanics Bank,* 1 *Stew. Eq. 165, 166; Coite* v. *Society for Savings Bank,* 38 *Conn. 173; Bunnell* v. *Collinsville Savings Society,* 38 *Conn. 203; Huntington* v. *Savings Bank, 96 U. S. 388.*

The bank possessed all the elements of a *quasi* public trust.

1. The founder of the institution is the state.

2. Its corporate franchises are a gift from the state.

3. It is regulated and administered by managers who have no property in the funds as such managers.

4. Its beneficiaries are the depositors, who have no voice or will in the selection of the managers or the management of the funds.

5. "Its fundamental object is to ameliorate the condition of those who are compelled to depend upon their labor for sustenance and the accumulation of property, by inciting them to the practice of habits of industry and frugality" &c. *Jackson* v. *Phillips et al., 14 Allen 556; Provident Savings Bank Case, 9 Cush. 609.*

(*b*) The legal *status* of the parties in the original proceedings.

By section 1 of the charter, p. 694, the Newark Savings Institution, the corporation, is created.

By section 4 of the act, p. 696, the corporation as such is constituted a trustee for its depositors.

Sections 4 and 5 of the charter give each depositor an equitable interest in the undivided profits of the corporation, which equitable interest can only be ascertained and adjusted in a court of chancery. The funds deposited with the said corporation belong to the depositors, the profits therein inure to their benefit. Does the relation of trustee and *cestui que trust* exist between the corporation and its depositors? Let us apply the test.

In whom is the legal estate?

In whom is the equitable estate?

The legal estate is in the corporation.

The equitable estate is in the depositors.

The managers are the agents of the trustee.

(*c*) The jurisdiction of the court of chancery over the subject-matter and parties in the original proceeding.

If the fund was a trust fund, and the relation of trustee and cestui que trust existed between the corporation and its depositors, then such fund, the trustee and cestui que trust were subject to the exercise of the jurisdiction of the court of chancery, whenever the circumstances were such as called for the interference of said court.

The petition set out such facts as made it highly proper and important for the court of chancery to interfere.

It in substance declared that the trust fund was in danger and prayed for the interference of the court, so that the trust could be preserved and an equitable distribution of assets made.

It is the usual practice, in such a case, to order the fund to be brought into court, so that it may be dealt with in the interest of all parties concerned.  Orphan Asylum v. McCartee, 1 Hopk. Ch. 435; Hoffman's Ch. Pr. 320 and cases there cited.

(d) Special facts upon which the court of chancery founded and exercised jurisdiction.

On the 12th day of December, 1877, a petition was filed in the court of chancery in behalf of the Newark Savings Institution, the corporation; or, in other words, in behalf of the depositors of the Newark Savings Institution (as will be seen from the object which it sought), which petition received the concurrence of the managers, with a request by them of its immediate presentation to the chancellor.

The petition was not filed on behalf of the Newark Savings Institution, praying relief against the depositors of the savings bank, nor on behalf of the managers of the bank, praying relief against the depositors therein, but, on the contrary, the managers invoked the aid of the court of chancery to protect the depositors of the savings bank, so that the depositors may equally share the trust fund committed to the care of the managers.  And the petition alleges:

"That with this view of their duties as trustees and the rights of their beneficiaries, and in consideration of the magnitude of the interests involved, the said managers are unwilling to proceed further in the execution of their trust without invoking the sanction and direction of this court in its jurisdiction over the administration of public and private trusts, being satisfied that.

Dodd v. Una.

without such direction they cannot maintain the institution in public confidence, or secure absolute equality among the owners of its assets, which is the fundamental principle of its organization."

The subject-matter and parties being within the jurisdiction of the court of chancery, the above facts merely show the means by which the court of chancery exercised jurisdiction. And as the fundamental proposition is that the court of chancery had jurisdiction of the subject-matter and the parties, the means which led to the exercise of that jurisdiction are only important to show a submission to the jurisdiction of the court of chancery by the managers, and which may be summarized as follows :

1. A petition was filed on behalf of the Newark Savings Institution.

2. This petition received the concurrence and approval of the managers of the bank, with a request by them of its immediate presentation.

3. The proceeding was not adverse to the interests of the depositors, but for their benefit and protection.

4. The depositors, or *cestuis que trustent*, were represented by the agents of their trustee in court.

Thus we have as the foundation of the exercise of the jurisdiction of the court : Jurisdiction of the subject-matter ; all the parties in interest represented.

It was upon this application, under the circumstances above detailed, that the chancellor, on the 12th day of December, 1877, made an order directing that all deposits received by said bank should be treated as special deposits, and invested only in the bonds of this state, and of the city of Newark, and of the United States &c., and which order was changed in some particulars, upon application of the managers, in relation to investments in real estate.

It is true that by the statute the savings bank had a more extended power in making investments, but it must be borne in mind :

1. That the order made by the chancellor was what was asked for by the managers.

2. That the order was granted conditionally, that if the man-

Dodd v. Una.

.agers were allowed to continue the savings bank, they would invest the special deposits only in such securities as mentioned in the order.

3. It was upon these conditional terms that the managers obtained the order.

4. It was accepted by the managers and acted upon by them.

5. It was held out to all new depositors by the managers that the deposits were subject to such conditions.

6. Ever since 1877 the order remained in force, and all changes made therein were made upon the application of the managers.

7. At the time of the obtaining of the first order, there were no new depositors whose interests could be affected; all new deposits being made after the order, became subject to the order.

8. As far as the restrictions upon the old depositors were concerned, they were acceded to and acquiesced in by them. It was not for the managers to complain, for they obtained what they asked.

DIVISION II.—*Point 1.* The court of chancery had jurisdiction in the original proceedings and therefore its adjudication in the proceeding against the appellant is final and not reviewable.

An appeal will not lie from a judgment in the court of chancery in a case of contempt; nor is the judgment subject to be relieved against in any manner, unless such judgment is absolutely void for want of jurisdiction. This is the settled law in England and in the United States.

In *Brass Crosby's Case, 2 Wm. Bl. 756,* De Grey, C. J., Gould, Blackstone and Nares, JJ., were unanimously of the opinion that no appeal can be had in cases of contempt. They say : " He appeared to be a member of the house of commons, adjudged by that house to be guilty of a breach of privilege and committed in execution by the authority of that house (now sitting) for the said offence. The house of commons is a supreme court of judicature with respect to its own privileges, and especially over its own members. This court never discharges persons committed for a contempt by any supreme court such as the two houses of parliament and the courts of Westminster hall. The

Dodd v. Una.

law has entrusted to these the power of judging of their own con-
tempts in the last resort.    If there lay any appeal from them it
would detract from their dignity, and they would cease to be su-
preme courts."    The court then cite the following cases : *Paston's
Case, 12 Edw. IV.* ; *Trewynard's Case, Dyer 59 b* ; *Chambers's·
Case, Cro. Car. 168* ; *Cro. Car. 579* ; *Lord Raymond 1108.*

The case in Dyer is entitled *Executors of Skewys* v. *Chamond.*

In *Brass Crosby's Case,* above referred to, reported in full in *3·
Wils. 204,* Justice Blackstone says :  " All courts, by which I
mean to include the two houses of parliament and the courts of
Westminster hall, can have no control in matters of contempt.
The sole adjudication of contempts, and the punishment thereof
in any manner, belongs exclusively and without interfering, to·
each respective court.    Infinite confusion and disorder would
follow if a court could, by writs of habeas corpus, examine
and determine the contempts of others.    This power to commit
results from the first principles of justice ; for if they have power
to decide, they ought to have power to punish ; no other court shall
scan the judgment of a superior court, or the principal seat of
justice ; as I said before, it would occasion the utmost confusion
if every court of this hall should have power to examine the
commitments of the other courts of the hall for contempts ; so
that the judgment and commitment of each respective court, as
to contempts, must be final and without control.    It is a confi-
dence that may, with perfect safety and security, be reposed in
the judges and the houses of parliament."

In the same case Lord Chief-Justice De Grey says ( p. 200)·
" In Chief-Justice Wilmot's time a person was brought by *habeas
corpus* before this court, who had been committed by the court
of chancery of Durham ; that court being competent, and having·
jurisdiction, the man was not discharged but recommitted."    On
page 201 the chief-justice continues :  " Perhaps a contempt in
the house of commons, in the chancery, in this court and in the·
court of Durham may be very different ; therefore we cannot
judge of it, but every court must be sole judge of its own con-
tempts."

In *In re Crawford, 13 Jur. 959,* Patteson, J., says : " It is only·

Dodd v. Una.

necessary for us to be satisfied that the court of chancery of the Isle of Man has the power of committing for a contempt for a libel upon it published while the court is not sitting. But it is only necessary for us to be satisfied that the court of chancery in the Isle of Man has the power of committing for a contempt, and I think by law it clearly has ; whether the document was a libel or a contempt of the court, it was for the court itself to determine. It has been adjudicated by a court of competent jurisdiction to be a contempt and we cannot review that adjudication."

See, also, *Queen* v. *Lefroy, 8 Q. B. 137*, opinion of Cockburn, C. J.

In the United States the decisions are almost unanimous on this subject.

In *Hayes* v. *Fisher, 103 U. S. 122*, Chief-Justice Waite says : "If the proceeding below, being for contempt, was independent of and separate from the original suit, it cannot be re-examined here either by writ of error or appeal. This was decided more than fifty years ago in *Ex parte Kearney, 7 Wheat. 38*, and the rule then established was followed as late as *New Orleans* v. *Steamship Co., 20 Wall. 387*."

In *State* v. *Towle, 42 N. H. 45*, the judge, after approving the principles laid down in *Passmore Williamson's Case, 26 Pa. St. 1*, says : "Does anybody doubt the jurisdiction of the district court to punish for contempt? Certainly not. All courts have this power and must necessarily have it, otherwise they could not protect themselves from insult or enforce obedience to their process. Without it they would be utterly powerless. The authority to deal with an offender of this class belongs exclusively to the court in which the offence is committed, and no other court, even the highest, can interfere with its exercise, either by writ of error, *mandamus* or *habeas corpus*. If the power is abused there is no remedy but impeachment."

In *Chappel* v. *Giles, 10 Wis. 88*, Judge Payne says : "It is essential to the very object of granting the power to punish for contempt that it should not be subject to appeal."

In *State* v. *Tipton, 1 Blackf. 166*, the court says : "It is the opinion of this court that in these cases we have no jurisdiction.

44

Courts of record have exclusive control over charges for contempt, and their conviction or acquittal is final and conclusive. This great power is entrusted to these tribunals of justice for the support and preservation of their respectability and independence; it has existed from the earliest period to which the annals of jurisprudence extend, and except in a few cases of petty violence, it has been sanctioned and established by the experience of ages."

In *Clark* v. *People, Breese 340* (reported in *12 Am. Dec. 177*), it was held : " The power to punish for contempt exists in all courts independently of the statute, and its exercise rests in the sound discretion of the court and is not reviewable elsewhere ; but if it be used maliciously or oppressively the remedy is by indictment or impeachment of the judge or magistrate."

A valuable note is to be found to this case on pages 178 and 179, wherein are collected all the leading cases on the subject.

In *Hunter* v. *State, 6 Ind. 423*, the court expressly decides that no appeal lies from the judgment of a court imposing a penalty for contempt, unless specially authorized by statute.

The same was held in *First Cong. Church* v. *Muscatine, 2 Iowa 69 ; Easton* v. *State, 39 Ala. 551*.

In *Robb* v. *McDonald, 4 Am. Rep. 213*, Judge Wright says: " The rule is well settled that in such cases, that is, when the party is being punished for a contempt, unless the proceedings leading thereto are so grossly defective as to render them void, the judgment of commitment cannot, in the absence of statute, be reviewed in any other tribunal."

In Kentucky it was held that the appellate court will correct an erroneous sentence, though it cannot retry the question of contempt, as where the punishment is greater than the law warrants. See *Bickley* v. *Commonwealth, 1 J. J. Marsh. 575 ; Turner* v. *Commonwealth, 2 Metc. 619*.

In *Davison's Case, 13 Abb. Pr. 129*, it was held that the proper remedy in case of irregularities in the proceedings by which a party has been adjudged guilty of contempt by a court of general jurisdiction, is by motion in the court in which the

Dodd v. Una.

judgment was rendered.   See, also, *Mitchell's Case, 12 Abb. Pr.*
*249.*

That no appeal lies from a judgment of contempt is also
held in *Passmore Williamson's Case, 26 Pa. St. 1; Ex parte
Kearney, 7 Wheat. 38; Watson* v. *Williams, 36 Miss. 331;
Cossart* v. *State, 14 Ark. 538; Vilas* v. *Burton, 27 Vt. 56; Re
Cooper, 32 Vt. 253; Ex parte Martin, 5 Yerg. 450; New
Orleans* v. *Steamship Co., 20 Wall. 387; Yates* v. *Lansing, 9
Johns. 395.*   See note 1, containing a collection of cases in ap-
peal from contempt, in *5 Crim. L. Mag. 152, and notes 1, 2
and 3, Id. 648.*

That a judgment for contempt is unappealable in this state
seems to have been the adopted view.   This is evidenced by the
absence of cases of contempt of the nature of the one under con-
sideration, either in the supreme court or court of errors and
appeals, for review; and, again, by the enacting of a law in
1884, by the legislature of New Jersey, providing for the review
of convictions and judgments for contempt of court, of courts
inferior in their jurisdiction to the supreme court, excepting the
orphans court.

In the case of *Knauss* v. *Jones* (court of errors and appeals),
*5 Stew. Eq. 326,* the proceeding for contempt was not a distinct
one, and was partly remedial and partly punitory.   The ground
evidently considered, and upon which the appeal was dismissed,
was that the order was interlocutory, and therefore not appeal-
able.                                                        •

But in the case under consideration the proceedings are dis-
tinct from any suit; they are not instituted for any remedial
purpose, but the object thereof is to bring the contemner of an
order of the court of chancery to punishment.   It may be said
that the appellant has the right to appeal by force of article VI.,
section 2, paragraph 5 of the constitution of New Jersey, which
provides that where an appeal from an order or decree shall be
heard, the chancellor shall inform the court in writing of the
reasons for his order or decree.   And then again section 114
of the chancery act (*Rev. p. 125*) provides "that all persons
aggrieved by an order or decree of the court of chancery may

appeal from the same, or any part thereof, to the court of errors and appeals."

The constitutional provision and statute referred to have received judicial construction in this state in *Coryell* v. *Holcomb, 1 Stock. 651,* where Chancellor Williamson says:

" The counsel for the appellants insist that an appeal is given by the constitution and by the statute from every order made by the court of chancery in the progress of a cause, and that this court has no authority to limit this right, but must hear this appeal. The broad ground taken by the counsel would lead to much more mischief, and be more oppressive to parties, than an erroneous decree or order which the right of appeal is intended to redress. But it is not warranted by the language or spirit of the constitution or the statute." The chancellor here cites the provision in the constitution and then continues: " This is all the constitution says upon the subject. The language, so far from justifying an argument that a party shall have an appeal from any and every order the chancellor might make, in the progress of a cause, rather implies the contrary. In matters of practice merely or of discretion, what would be the object in the chancellor's furnishing the court with his reasons in writing?" &c. The chancellor, after citing the statute which gives the right of appeal, says: " Without defining the character, or attempting to classify the orders of the court of chancery which may and may not be appealed from, it is certain there can be no appeal from an order by which the party is not aggrieved " &c.

Now, it may be said that the case of the appellant comes within the statute, as he is aggrieved. Let us see. It is respectfully submitted that the statute does not apply to cases where at common law the right of appeal did not exist. This is certainly the meaning of the constitutional provision referred to, and the construction placed upon it by the chancellor. That the right of appeal did not exist at common law is fully sustained by the cases before cited. A similar rule exists in the state of New York. Such an eminent jurist as Chief-Justice Kent, in *Yates* v. *People, 6 Johns. 424, 425, 426,* &c., declares that no appeal will lie from a conviction for contempt. In *Peo-*

*ple* v. *Wilson*, *64 Ill. 195* (*16 Am. Rep. 545*), the court say: "The power to punish contempt is original with all courts of justice and is determined by the principles of the common law, and is not limited by existing statutes." See *Miller* v. *Knox, 4 Bing. N. C. 595*.

Another ground upon which the right of appeal is claimed not to exist is, that the statutory provision does not apply to proceedings for contempt of the nature under consideration. The statute gives the right to either or any of the parties to a suit to appeal from an order by which either or any of them is aggrieved. It can therefore only apply to cases where any party to a suit would have the right to appeal. This leads to the inquiry, What is the true nature of these proceedings? While it is true that these proceedings are instituted upon the petition of several depositors of the Newark Savings Institution, it does not thereby become a suit between the parties. The court of chancery could, upon its own motion, upon the knowledge that its orders have been contemned, have instituted the proceedings against the appellant. The prosecutors had no interest in the proceedings which could have been affected one way or another. If the appellant had been acquitted, the prosecutors could not be said to have been aggrieved. No right of theirs would have been affected or disposed of. When the court of chancery granted a rule to show cause, the proceeding assumed the nature of an inquiry instituted by the court. The court was both *actor* and *judex*. It was the invoking of the power of the court to maintain its dignity and authority.

Authorities of the highest standing have called these proceedings criminal proceedings; others call them *quasi* criminal proceedings, and still others, *quasi* civil proceedings.

In the authorities before cited on the question whether an appeal lies, the nature of these proceedings is discussed.

There can be no dispute that proceedings like the one under discussion are *quasi* criminal proceedings.

There is some conflict of authority as to cases where the proceedings are between parties, the object thereof being remedial, whether the party instituting the proceedings can appeal from an

order discharging the rule. In the state of New York, there are authorities on both sides of the question. From the cases on the subject of contempt, in the various states, the following can be extracted :

Where the proceeding for contempt is remedial in its nature, either party aggrieved by the order of the court may appeal.

Where the proceeding for contempt is remedial in its nature, and also involves punitory consequences, the party aggrieved may appeal.

Where the proceeding for contempt is purely for the purpose of punishing the contemner, no appeal therefrom lies by either party. This places proceedings for contempt committed out of the presence of the court, when the object is to punish the contemner, on the same basis with contempts committed *in facie curiæ*, and this is where they properly belong.

There would be no sense in permitting an appeal from a case where the proceeding for contempt is punitory, on the part of the state, for it is to be presumed that every court will uphold its dignity and authority by the exercise of this inherent power.

An additional reason that the statute permitting an appeal does not apply to cases of contempt is, that the statute applies to cases of a civil nature only. As has been before said, distinct proceedings for contempt are held to be *quasi* criminal proceedings. When the object is punitory, in addition to the authorities already referred to, the following authorities declare them to be criminal proceedings: *State* v. *Gilpin, 1 Del. Ch. 25–28 ; Fanshaw* v. *Tracy, 4 Biss. 490–497 ; Baltimore &c. R. R. Co.* v. *Wheeling Bridge Co., 13 Gratt. 40, 57.*

Now, it can be argued with force that the proceeding in a contempt case being a criminal proceeding, the proper remedy to review a judgment therein would be by writ of error, and not by appeal. The statute gives every defendant a right to a writ of error in a judgment against him in a criminal proceeding.

That proceedings for contempt were considered unappealable in England is apparent from the fact that in all cases the writ of *habeas corpus* was resorted to. It was upon the hearing of the *habeas corpus* cases that the judges were unanimously of the

Dodd v. Una.

opinion that neither the facts nor the commitment in a contempt case were reviewable, and it was in these cases that the doctrine was laid down that each court was the sole judge of its own contempts.    For centuries this has been the settled law of England. If it will only be considered that this inherent power to punish for contempt stands above the statute law ; that the due enforcement of the common and statute law depends upon the mere fact that such power exists ; that it is the right arm of the court to enforce the right of administering the law ; that it is the shield which protects the court from insult and disobedience ; that it is this invisible power which commands silence and decorum in the court-room, invests the judge with dignity—then it at once becomes apparent that any interference with the exercise of this power by the delay of an appeal or otherwise, is the serious weakening of a power, the impoisoning of a vitality, which are necessary to sustain a court of justice.

DIVISION II.—*Point 2.* The court of chancery having jurisdiction in the original proceeding, even though the order made by said court was erroneous, it nevertheless must be obeyed.    In addition to the cases cited by the honorable vice-chancellor in his opinion in support of this proposition are the following : *Partington* v. *Booth, 3 Meriv. 149 ; Moat* v. *Holbein, 2 Edw. Ch. 188 ; Kemp's Lessee* v. *Kennedy, 5 Cranch 173 ; Woodward* v. *Earl of Lincoln, 3 Swanst. 626 ; Watson* v. *Citizens Savings Bank, 5 So. Car. 159, 179 ; People* v. *Bergen, 53 N. Y. 404–410 ; Spalding* v. *People, 7 Hill 304; Ex parte Park, 3 Otto 18 ; Re Callicot, 8 Blatch. 89 ; Ex parte Stickney, 4 Ala. 160 ; Re Cohen & Jones, 5 Cal. 494.*

The fact that the order was erroneous does not make the order void nor bring the case within the exception that an appeal lies in a case of contempt where the court had no jurisdiction.    See cases before cited.

DIVISION III.—*Point 1.* The facts adduced in the proceedings against the appellant prove him guilty of a willful contempt.

In paragraph 12, pages 17 and 18, the appellant admits the

violation of the order of the court.   He seeks to excuse this violation by the plea that he intended the ultimate good of the bank. This is no defence.   See *State* v. *Morris and Essex R. R. Co., 3 Zab. 369, 370.*

The plea that the appellant intended the ultimate good of the depositors would probably avail in mitigation of punishment.

That the defendant has violated the order of the court of chancery is conceded in the answer; whether he did it once, twice or thrice cannot affect the correctness of the adjudication of the vice-chancellor.

*Mr. Frederic W. Stevens,* for respondent.

This is an appeal from a decree of the court of chancery, advised by Vice-Chancellor Van Fleet, adjudging Daniel Dodd, the late president of the Newark Savings Institution, to be in contempt for having violated an order of that court.

The case will be considered under the following heads:

I. (*a*) The legislation affecting the Newark Savings Institution.

(*b*) The legal proceedings affecting the institution and its managers.

(*c*) Such being the legislation and orders affecting the corporation and its managers, I now enter upon a consideration of their acts.   Before doing so, however, it may be proper to state that the managers were all made parties to the proceeding now under review.   Some of them demonstrated their innocence, and others, by a lenient construction of their conduct, were excused.   Daniel Dodd alone was found guilty, and he alone appealed, so that the inquiry is narrowed down to him, except in so far as it is impossible to separate his acts from those of his associates.   As his disobedience of the above-mentioned orders is glaring, it will only be necessary to refer to the more prominent facts.

It is quite apparent that Dodd alone directed the affairs of the institution, and it was this fact, more than any other, which, no doubt, induced the court to absolve the other directors from responsibility.

Dodd *v.* Una.

The transactions which require detailed examination are those connected with Fisk & Hatch. As has been shown, they consist (1) of loans of money ; (2) of loans of bonds.

II. But the proper construction of this order is a matter of little consequence at this time, as will be seen hereafter. The facts being as above stated, the important question is, Did the court have jurisdiction to make the order of December 12th, 1877 ?

It is said that even if the order were in terms violated, it is a nullity for the reason that the court had no jurisdiction to make it. As this point was very warmly urged in the court below, and will doubtless be still more warmly urged here, and is a question of the greatest consequence, involving, as it does, the legality of all the orders made by the chancellor in the case of the Newark Savings Institution, as well as in the case of other similar institutions, it will require a critical examination.

The proposition of the appellants is this : That the savings institution is not a public trustee or charity, but a mere banking corporation, to regulate which the court of chancery has no inherent jurisdiction, so long as it remains a going concern ; and inasmuch as the court assumed jurisdiction not to wind up the institution as insolvent, but to regulate its action in a manner contrary to the provisions of its charter and by-laws, and contrary to the contract relations subsisting between it and its depositors, the action of the court in so doing was a usurpation of power, and its acts *coram non judice* and void.

This, I think, is a strong and full statement of the appellant's position, at least as it was presented in the court below. I am willing to concede that if his premises are correct, his conclusion will follow. The whole argument, however, rests upon the assumption that the savings institution is a banking, as contradistinguished from a public or charitable, corporation. The reasoning is this: The institution is either a public trustee or a banking company. A public trustee is no other than, and synonymous with, a charity ; a charity can only be created by gift (and for this a long line of authorities were cited in the

court below). As this institution was created not by gift but by act of legislature, it is not a public trustee or charity; consequently, adopting the other horn of the dilemma, it is a banking corporation. As subordinate to, and in aid of, this, his main argument, he contends that the relation between the institution and its depositors is a contract relation only, with which a court of equity has nothing to do.

· Now, this is a very plausible, but utterly fallacious, statement of the case. First, the foundation of the argument, viz., that this is either a public trustee (meaning thereby a charity), or a banking corporation (meaning thereby a banking corporation in the ordinary and statutory acceptation of that term), is untrue. As a matter of fact, the institution is neither.

(a) It is not a banking corporation. *McLeod Elements of Banking 152; Say on Political Economy book 1 ch. 22 p. 270 § 3; Burrill Law Dictionary; Rev. Stat. "Banks" p. 58 § 1.*

Now, the savings institution is not possessed of a single one of these distinctive features. In the first place, it is expressly forbidden, by its charter, to issue any notes or bills. Section 6.

In the second place, it is forbidden, by the general banking act, "to discount any note, bond, bill or other obligation as a banking institution." *Rev. Stat. "Banks" p. 69 § 57.*

In the third place, it is forbidden by the same general act (section 57) from "establishing, directly or indirectly, within this state, any office of discount and deposit."

Indeed, all these prohibitions are, by necessary implication, contained in the charter itself, on the well-settled principle that a corporation is restricted to the powers conferred upon it expressly or by necessary implication. *Burrell v. Dollar Savings Bank, 92 Pa. St. 137; 9 Cush. App. 608, 609; Huntington v. Savings Bank, 96 U. S. 388.*

The legislative design, then, may be briefly summarized thus:

1st. To create a corporation, with power to receive deposits for investment, and for investment only, on such terms as it might prescribe.

2d. To limit the range of investment within narrow bounds,

and to require that the investments actually made should be made, not in the name of the depositors, but of the corporation.

3d. To hold the principal sums deposited, and all the profits derived from their investments, exclusively for the benefit of the depositors.

The relationship thus created is no other than that of trustee and *cestui que trust* in the strictest sense. The legal title is divorced from the beneficial interest. The former resides only in the corporation, the latter only in the depositors, and not tortiously, but according to the intent of the parties. The trust thus arising is of the kind denominated by Mr. Pomeroy, in his Equity Jurisprudence, an express, active trust.

It would seem hardly necessary to support this position by argument, had it not been so confidently denied. But, as it is a question of so much importance in the determination of this controversy, a somewhat minute examination of it will not be deemed impertinent.

What, then, are the elements of a trust such as equity administers? All the text-writers trace its origin to the *uses* which prevailed prior to the statute of *27 Henry VIII. Story Eq. Jur.* § *969.*

A use is thus defined in *Viner's Abr. tit. " Use" A 3: "*An use is a confidence and trust, which *cestui que use*  \*  \*  \* hath, for him and his heirs, in the other or his heirs to whom the estate is given ; and there must be a privity of estate between them, for there be sundry persons that cannot stand seized to an use, especially where this privity fails. This confidence and trust which makes the use is not issuing out of the thing given, but is collateral and annexed to the person ; ·for the use is *usus fructus*, which is reserved to the giver, where he hath given away the property to another ; for he hath neither *jus in re* nor *jus ad rem*, but only a confidence, which, if it be broken, he hath no remedy but a subpœna in chancery." *Willis on Trustees, 10 Law Lib. \*72 ; Comyn's Digest " Use ; " Sanders on Uses \*278 ; 1 Spence's Eq. Jur. \*491,\*492 ; 1 Perry on Trusts,* § *13 ; Lewin on Trusts ; Tiffany & Bullard on Trusts 1.*

· To every feature of a trust, as delineated in the foregoing

pages, the Newark Savings Institution, in its corporate capacity, conforms. The mere fact that it is a *corporation* will not, in the slightest degree, affect the matter. The court of chancery will as readily lay hold of a corporation if, in the application of its ordinary rules, it finds it to be a trustee, as it will of any individual. *2 Spence's Eq. Jur. 34.* Charitable trustees are generally corporate bodies, and the fact that this court has already declared savings institutions "*quasi* charitable and purely benevolent," would rather predispose it to see, in such an institution, all the elements of a perfect trust. That these elements exist will now be apparent.

1st. The institution, in its corporate capacity, holds the legal title.

2d. The depositors alone possess the beneficial interest.

3d. This interest can only be adequately protected in the court of chancery.

I will now consider the authorities. These are few in number, savings banks being of quite recent introduction. The first English statute on the subject is that of *57 Geo. III.* (A. D. 1817). The first charter that I find in this state was that given to the Newark Savings Fund Association in 1828.

Two cases may be cited against the view for which I have been contending. The first is *Savings Bank* v. *Makin, 23 Me. 350.* This case presented a double aspect. Makin sued the institution at law; it filed a bill against him in chancery. *23 Me. 360.* The court were divided in opinion, two judges holding that the case was not one of trust, the chief-justice holding that it was. Page 370 of report. The principal ground upon which the majority founded their opinion was that the institution undertook absolutely to repay the depositor his principal with four per cent. interest (p. 356), whether such money had been earned or not; while in the case in hand no such engagement was ever made, and, had it been, it would have been contrary to the provisions of the charter, which only permits the *earnings* to be divided. Not a single authority is cited in the case of the suit at law, and the reasoning is exclusively on the charter and by-laws, which differ considerably from those of the Newark Sav-

ings Institution. The reasoning itself is neither very clear nor very satisfactory, but the case is obviously distinguishable.

The other case is that of *People* v. *Mechanics & Traders Savings Inst., 92 N. Y. 10.* That institution was originally incorporated by special act, but the charter was, by act of 1875 (*P. L. of 1875 ch. 371 § 52*), superseded by a general act respecting savings banks, one of whose provisions was "that the sums deposited shall be repaid to such depositors respectively * * * after demand, in such manner, and at such times, and after such previous notice as the board of trustees shall prescribe." Section 23.

In the very brief opinion written by Andrews, J., in that case, he says: "The primary relation of a depositor in a savings bank to the corporation is that of creditor. * * * There is nothing like a private trust between the corporation or its trustees and the depositors in respect to the deposits." The point decided was that creditors had no priority over depositors in the distribution of assets. The case had been decided the other way in the supreme court, the view there taken being that the depositors were *cestuis que trustent. 28 Hun 376.* And only three years before, in the very same court of appeals, in the case of *Hun* v. *Cary, 82 N. Y. 65,* Earl, J., had said the relation existing between the corporation and its trustees is mainly that of principal and agent, and the relation between the trustees and the depositors is similar to that of trustee and *cestui que trust.*

It is also held, in New York, that on the insolvency of the company the depositor may set off the amount of his deposit against his mortgage indebtedness. *New Amsterdam Savings Bank* v. *Tartter, 54 How. Pr. 385,* a decision which is opposed to *Hannon* v. *Williams,* decided by this court. Under these circumstances the case of *People* v. *Mechanics Sav. Inst.* is entitled to no great weight.

On the other hand, the cases cited by the chancellor in the matter of the *Newark Savings Institution, 1 Stew. Eq. 552,* and in *Stockton* v. *Mechanics Savings Bank, 5 Stew. Eq. 163,* sustain the view for which I am contending. *Bunnell* v. *Collinsville Sav. Soc., 38 Conn. 203.*

I have been able to find only two other cases in addition to

those cited by the chancellor—*Holmes* v. *Henty, 4 Cl. & Fin.* *100, and *Reg.* v. *Fletcher, L. J. 1862, vol. 31 (N. S.) part 3 p. 206.*

III. The court of chancery had jurisdiction over the parties.

The facts are these : The managers, at a meeting held December 12th, 1877, at which Dodd was present, having heard the petition read, passed the following resolution :

" Resolved, that the petition read be approved, that the managers sign the same, and that it be attested by the president and secretary, and forthwith presented to the chancellor."

The petition was presented pursuant to the resolution. It purports to be the petition of the corporation. In it the managers joined by a formal certificate appended thereto and signed by them. They therefore, on their own motion, came into court and asked for the order which the court made.

After having disobeyed it they assert it to be a nullity for two reasons—(1st) because the proceeding should have been by bill and not by petition ; (2d) because the depositors were not parties to it.

Here is a strange spectacle indeed. The very managers who elected to proceed by petition rather than by bill ; the very managers who themselves are responsible for not having made the depositors parties, ask, in this collateral way, that the order be adjudged void, not because any depositor is shown to have been injured, but because they who were in court and were heard, are shown to have disobeyed it. It is much to be doubted whether so extraordinary a defence was ever before presented so boldly. No wonder the court below animadverted upon it.

If these managers had taken a direct appeal from the order of December 12th, 1877, and alleged as causes of appeal the two objections now set up, would the court of appeal have listened to them ? Would they have been permitted to show as reasons for reversal their own erroneous acts, not in the least prejudicial to themselves, however much the depositors might have complained of them ?

The error complained of must be such as aggrieves the party

Dodd *v.* Una.

·complaining.    *Osborne* v. *Tunis, 1 Dutch. 649.; Graham* v.
*Whitely, 2 Dutch. 260 ; Leport* v. *Todd, 3 Vr. 124; Coryell* v.
*Holcombe, 1 Stock. 650 ; Knauss* v. *Jones, 5 Stew. Eq. 323.*

Does this, the very order which they sought, aggrieve these
managers ?

The objection on the score of parties is a more substantial one,
·and if a depositor were now before the court complaining of
some injury to his right, it might merit attention.    But the
party now complaining is one of the very persons who sought
and obtained the order desired ; and that action was, in his case
at least, highly beneficial.    By its means he continued to be
president, in the enjoyment of the salary attached to that office.
Shall he, then, a party to the order, asking for and obtaining it,
be now, on a ground merely personal to himself, allowed to im-
peach it, and to impeach it, too, in this collateral way, for the
·sole purpose of relieving himself from the consequence of his
disobedience to it ?

Cases of a defect of necessary parties come to light almost
·daily, and the rule invariably applied is that, so far as the actual
parties to it are concerned, the decree binds.    *Kirkpatrick* v.
*Corning, 11 Stew. Eq. 234.*    Any other rule would be fraught
with the most dangerous consequences.

IV.    It has thus far been shown (1) that the court had juris-
diction over the subject-matter ; (2) that it had jurisdiction over
the parties.    Its jurisdiction, therefore, completely attached, and
its decision, even if erroneous, cannot be called in question col-
laterally.    *Combe* v. *Edwards, L. R. (3 Prob. & Div.) 103 ;
Munday* v. *Vail, 5 Vr. 419 ; Duchess of Kingston's Case, 2
Smith's Lead. Cas. *587,*667 ; 2 Spence's Eq. Jur. *34 ; Russell*
v. *East Anglian R. W. Co., 3 Macn. & G. 104, 117.*

V.    The court below having jurisdiction to grant the original
·order of December 12th, 1877, the order adjudging Dodd guilty
of contempt, and now brought up for review, is not appealable.
The well-settled rule is that no appeal lies from the judgment
·of a court of competent jurisdiction in a contempt proceeding.
As my associate has collected so many authorities on this point,

and the question is so well settled, I shall here do no more than refer to it.    *Williamson's Case, 26 Pa. St. 1.*

VI. Even if the court erred in deciding that a trust existed, the question was one which it was competent and bound to decide, and the error, if any, can only be corrected by appeal. It cannot be impeached collaterally. *1 Pomeroy's Eq. Jur.,* §. *129; Creeps* v. *Durden, 1 Smith's Lead. Cas. \*827 ; Cox* v. *Thomas ; People* v. *Sturtevant, 9 N. Y. 274; Bradley* v. *Fisher, 13 Wall. 352 ; Loftus* v. *Fraz, 14 Vr. 667 ; Grove* v. *Van Duyne, 15 Vr. 655.*

The opinion of the court was delivered by

MAGIE, J.

Before proceeding to state the questions presented by this appeal and my conclusions, some preliminary observations may properly be made.

The original petition of the Newark Savings Institution, it must be observed, did not seek relief on the ground of an admitted insolvency, nor upon any statutory or other power of the court to intervene to distribute its assets as those of an insolvent corporation. It did not seek the winding up of the institution, nor the immediate distribution of assets, but the plainly apparent object of the petition and the order made thereon, was to so distribute the assets as to save and not to impair what was called the usefulness and permanency of the institution.

That the legislative authority which creates institutions of this character may provide, that in cases of insolvency, some court may intervene and administer the assets, is incapable of question. Nor do I think it capable of doubt that legislative authority may, if constitutional guaranties are not violated, provide that such institutions, when in danger of insolvency, may, by a summary proceeding, be taken into the control of a court and managed under its direction, so as not only to bring about an equitable distribution of assets, but also, if possible, to continue the existence of the institution, with its chartered rights and privileges unimpaired. Such legislation has been resorted to in this

Dodd *v.* Una.

state, and the act approved April 5th, 1878 (*P. L. of 1878 p. 421*) is designed to confer on the court of chancery such power.

But this petition and order preceded this act, and the validity of the proceeding is dependent upon the inherent power of the court of chancery, not derived from any specific statute.

The opinion of the learned chancellor, on which the order of December 12th, 1877, was made, is reported in *1 Stew. Eq. 552*. From the opinion it appears that the order was made on the ground that the petitioning institution was a general or public trustee, holding the money of its depositors in trust for investment, that the assets of the institution were held as a common fund for the security of all depositors, and that the subject-matter of the petition thus came within the right of the court of chancery to administer trusts.

It should further be observed that the original proceeding was wholly *ex parte*. No parties other than the petitioner were before the court, unless the managers, by virtue of their consent appended to the petition, or their conduct in reference thereto, can be considered to have become parties. The right of the court to deal with the subject-matter of the petition, in the absence of parties whose interests were thereby materially affected, was not discussed in the opinion last mentioned.

With respect to the proceeding initiated by the petition of respondents, whereon the order now appealed from was made, it should be observed that the proceeding was treated by the parties and the court as one in the interest of the petitioners, whose deposits had been largely affected by the misconduct charged, prosecuted in their behalf and under their control, and not as a proceeding initiated by the court to preserve its own dignity and power, and to punish those who had insulted the one or defied the other. The issue was made up not from formal interrogatories and answers under an attachment, but from the respective allegations of the petition and answers. Upon the issue so presented the parties were permitted to take testimony in a foreign state (*Una* v. *Dodd, 11 Stew. Eq. 460*), under the provisions of the evidence act (*Rev. p. 384* §§ *38, 39*), and on that evidence and

45

other evidence orally presented before one of the vice-chancellors, the order was made.

The question which naturally first presents itself as important on this appeal relates to the extent of the reviewing power of this court in such cases. The order alleged to have been disobeyed has never been appealed from, and stands unreversed. The court which made it has determined that it has been disobeyed, and thereby a contempt of that court has been committed worthy of punishment. In reviewing that determination, how far may the original order be examined?

It seems to me unnecessary to take up this question—at least before making a preliminary inquiry. For it is conceded by respondent's counsel, in their very able arguments, that unless appellant is prevented by his conduct from raising the question, the jurisdiction of the court of chancery to make the original order may be reviewed. While they contend that no person is to be permitted to test the regularity or propriety of an order by disobeying it, and while they insist that a decree adjudging a party guilty of contempt for such disobedience is not reviewable, yet they admit that if the disobeyed order was one wholly without the jurisdiction of the court which made it, so that it was, when made, *coram non judice* and void, such lack of jurisdiction will be fatal to the proceedings for contempt, and an order adjudging contempt will be reviewable.

This accords with the well-settled doctrine that any decree or judgment made without jurisdiction and void, may be questioned even in a collateral proceeding. *Munday* v. *Vail, 5 Vr. 418.* In proceedings for contempt the jurisdiction of the court to make the order alleged to have been disobeyed may be questioned on an application for an attachment. *People* v. *Sturtevant, 9 N. Y. 263.* Or on a *habeas corpus. Ex parte Fisk, 113 U. S. 713.*

This preliminary inquiry becomes essential in this case because appellant, by his counsel, strenuously contends that the order which he has been found to have violated was not, when made, within the jurisdiction of the court of chancery.

It is not improper to state that this question has been approached

with a very strong sense of the propriety of upholding the juris-
diction which has been twice adjudged by the court of chancery
to have been possessed by it, and on the unchallenged exercise
of which jurisdiction large numbers of depositors have doubt-
less relied with confidence. A jurisdiction thus asserted and
acted upon with such consequences, ought not to be now denied
unless it is very clear that it was erroneously asserted.

The first question, then, is whether the order of December 12th,
1877, was within the jurisdiction of the court of chancery.

As we have seen, the jurisdiction of that court was put by the
learned judge who signed the order, on the right of the court of
chancery to administer trusts.

When the proceeding for contempt came on before the vice-
chancellor, this question of jurisdiction was raised. His opinion
is reported in *12 Stew. Eq. 173.* His view was that the assets of
a savings bank, when in the condition shown by the petition,
were held in trust for its depositors. He held that it was a
matter of no importance whether the trust was a public trust, a
*quasi* charitable use, or a private trust, for the jurisdiction of the
court over every trust relation was complete, and its adjudica-
tion, whether correct or erroneous, was conclusive until reversed.
As to the presence of parties sufficient to justify the order, his
view was that it was impossible, according to settled rules of
procedure, to bring any other party before the court than those
who were present, and that jurisdiction was at least acquired
over the managers, whom he held to have been parties to the
proceeding.

In the argument addressed to this court, the counsel of re-
spondents support the jurisdiction of the court of chancery solely
upon its right to administer trusts. They insist that the relation
of the institution to its depositors was one of trust, either a pri-
vate trust, or one which they call *quasi* charitable or *quasi*
public, and that jurisdiction was capable of being exercised in
this proceeding, at least so as to be binding upon the managers
of the association.

The questions suggested by these contentions respecting the
relation between a savings bank and its depositors are these, viz.:

Whether the relation in all cases is that of debtor and creditor, or that of trustee and *cestui que trust*; whether the relation between a solvent bank and its depositors differs from that between an insolvent bank and its depositors; and what is the relation in the condition presented by this petition. In *Hannon* v. *Williams, 7 Stew. Eq. 255*, Judge Green declared in this court that a savings bank was a *quasi* charitable and purely benevolent institution, and that the depositors occupied to the corporation a double relation—one, resembling that of stockholders in other corporations, and the other, that of creditors. He said: "In prosperity they are the stockholders, among whom profits are divided; in case of insolvency, they are the creditors, among whom the remaining assets are to be distributed." In *Chester* v. *Halliard, 9 Stew. Eq. 313*, Chief-Justice Beasley, in his opinion in this court, declared that depositors in an insolvent savings bank, who sought to recover from directors moneys of the bank lost by their negligence, were but creditors of the corporation. In *Williams* v. *McKay, 13 Stew. Eq. 189*, it was declared in this court that the relation of managers of such an institution to depositors was a relation of trust, so that the statute of limitations would not run with respect to a claim by depositors against managers for losses occasioned by their mismanagement. Whether these cases establish the doctrine that a savings bank is, under all circumstances, or under the special circumstances shown in the petition presented in the proceeding now under discussion, a mere trustee for its depositors, need not, in my judgment, be determined.

If the depositors were only creditors, and if their relation to the institution was one of contract only, then the claim of jurisdiction on the facts shown is admittedly erroneous.

It can be sustained, if at all, only upon the ground of the relation being one of trust. I shall assume that the relation is of that nature, and so examine the question of jurisdiction.

Many definitions may be found in the books declaring what jurisdiction is, but I have encountered none more concise and complete than that given by Chief-Justice Beasley in *Munday* v. *Vail, 5 Vr. 422*, where he declares it to be "the right to adjudi-

·cate concerning the subject-matter in a given case." There must be, therefore, a subject-matter presented, which is within the jurisdiction, and that subject-matter must be so presented in the ·case before the court as to justify action thereon.

Assuming, then, a relation of trust, it was suggested below that it was a trust of a public nature, by which I understand, a charity. A charity, under all definitions of it, arises by reason of something in the nature of a gift to some general public use, and in general to be applied to an indefinite class or number of persons. *2 Perry on Trusts* § *697*, and cases in note, particularly the opinion of Gray, J., in *Jackson* v. *Phillips, 14 Allen 593*. But here is no gift or benefaction; there are no beneficiaries; the deposits are of the money of the depositors; they are deposited upon defined terms; and those interested are not indefinite, but known. If such institutions can properly be called charitable or benevolent I apprehend the terms are applied not in the legal sense, but as expressive of that kind of benevolence which aids others by enabling them to aid themselves, as these institutions .have been well said to do by encouraging habits of thrift, and enabling small savings to be put to use.

This trust, moreover, if it be such, was to be administered according to fixed and defined terms. The charter and the by-laws made thereunder prescribe accurately on what terms the deposits are to be taken, invested and returned. It is the trust .so defined that the institution was bound to administer.

The petition did not represent that the terms of the trust had 'been violated, or the trust abused. On the contrary, it showed that the trust had been and was being administered according to its terms, except so far as they may have been violated by the investments which had depreciated. What the institution complained of was, that a faithful performance of the terms would result in injury, and it asked not that it should be enjoined from ·departing from those terms, but that it should be authorized and .permitted to do so; in other words, that new terms should be impressed thereon because equitable to do so. This is not ad-.ministering, but creating a trust.

If it be suggested that insolvency, in the case of such an in-

stitution, might impress on the assets a new term of trust, viz.,. for equitable distribution, the reply is, that if such a trust would come within the jurisdiction of a court of equity, without statutory authority (by which such jurisdiction has generally been conferred), the case was not presented because insolvency was not. shown.

But if the subject-matter presented by the petition came clearly within the jurisdiction of the court, I am unable to perceive how it could be exercised in this case, while not a single one of those whose interests as *cestuis que trustent* were so largely affected, was a party so as to be heard on the subject.    It is true that the order refrains from enjoining depositors from demanding their deposits, as the petition prayed, but if it had any value, it accomplished the same object by enjoining the institution from paying any depositor, although he should demand his deposit according to. the terms of the charter and by-laws.    I conceive a fair test of the validity of this order exists in this restraining clause.    For it is clear that it would not have protected the institution from. some legal proceeding on the part of a depositor to recover his. deposit according to its terms.    If a successful prosecution of such a proceeding should compel the officers of the institution to. pay such deposit, I apprehend that no proceeding against such an officer for contempt would or could have been available.

This objection is not obviated even by a successful contention that this was a charitable trust.    Jurisdiction to proceed upon. such trusts in a summary way is not inherent in the court of chancery, but only obtained by statute.    The act called Sir Samuel Romilly's act, being *52 Geo. III. c. 101*, conferred such jurisdiction on the English court of chancery, and it was. held, under that act, that strict conformity to the procedure established by it, and the presence of proper parties under its terms, was requisite.    *In re Dovenby Hospital, 1 Myl. & Cr. 279 ; Wellbeloved* v. *Jones, 1 Sim. & Stu. 40 ; Attorney-General* v. *Earl of Stamford, 1 Phil. 737 ; Ex parte Seagears, 1 Ves. & B. 496 ; In re Hall's Charity, 14 Beav. 115 ; Attorney-General* v. *Green, 1 Jac. & W. 303.*    However broad the power of the court of chancery over such trusts in this state may be, it has.

Dodd *v.* Una.

always been exercised in conformity with its procedure and practice in other cases. *Attorney-General* v. *Moore, 4 C. E. Gr. 503 ; 2 Perry on Trusts 376 ; Hesketh* v. *Murphy, 9 Stew. Eq. 304.*

Such a summary proceeding may doubtless be authorized, and the act of 1878 provides for such a proceeding.

Legislation of this character clearly indicates the previous absence of the authority thus conferred.

So far I have dealt with the order in reference to its general scope, and particularly its operation on the invested funds of depositors, who were such on December 12th, 1877. Assuming those funds to be trust funds, my conclusion has been that jurisdiction to make the order in those respects was, upon the case before the court, wanting.

But if that conclusion should be deemed erroneous, it will not, in my judgment, affect the case before us.

The disobedience for which appellant has been adjudged in contempt related to that part of the original order which fixed and prescribed the securities in which future deposits with the institution should be invested. What should be done with future deposits was a subject-matter presented by the petition. With respect to that subject-matter, I think it was well remarked by the vice-chancellor that no other parties could be brought before the court than those who were parties to the petition. No other parties existed.

The sole ground on which this order is sought to be sustained is the right of the court of chancery to administer trusts. But with respect to future deposits, there was neither property to be held in trust nor persons who were *cestuis que trustent*. No trust had yet come into existence. No relation of trust had yet been created.

Furthermore, the petitioner was an incorporated body, with powers derived from acts of the legislature, which imposed duties upon it, and particularly, in terms which were carefully specified, enacted in what securities the deposits should be invested. The power and duty of selection within the range of the securities mentioned, was devolved on the managers of the institution, and on no other persons.

Viewed in this aspect, the order which limited the range of securities for investment, I feel constrained to say, was an exercise of a power not accorded to any court. It restrained the power which had been granted to the institution by the legislative authority. It relieved its managers in part from the duty which had been imposed on them by like authority, and which was thereby, without authority, assumed in part by the court. The order, in its practical effect, amended the legislative enactment.

That the order restrained the selection within the range of securities fixed by the acts does not alter its effect, for it plainly relieved the managers from some part of the duty imposed on them, and limited the power granted to them. That the securities selected by the order were those which were safest and best under the circumstances, does not affect this question. The right to select at all must include the right to select any, though less worthy or not worthy of confidence. If the order had directed investments in securities not permitted by the acts, or had directed deposits not to be invested, would any one pretend that it would have protected the officers in disobedience of the law ? If the securities permitted by the order were unobtainable, or not obtainable at prices justifying their purchase, could it be even plausibly argued that the officers would be justified in investing at a loss, or in leaving deposits uninvested ? It seems to me that these questions answer themselves, and that it is clear that neither could the managers abdicate their position of power and duty under the charter, nor could the court of chancery assume it.

In the aspect of this order which directly affects the case before us, I am driven to the opinion that the court had no scintilla of power, and its jurisdiction being wanting, its order, at least to that extent, was valueless and void.

It is further insisted that the appellant was the president of the institution, and made the affidavit annexed to the petition ; that he united with other managers in presenting the petition, and that he thereby aided in convincing the court that it had the jurisdiction which he now challenges. It is suggested rather

Dodd *v.* Una.

than argued, that he ought not now to be permitted to question the doctrine he then maintained.

Appellant has presented the question of jurisdiction to this court. We are not called on to decide how far his conduct in now raising the question accords with honor, but we are bound to consider the question so presented, unless there is some legal ground for shutting our ears to his claim. I am unable to discover any ground to refuse to hear this objection, which will not violate the well-settled rule that consent will not confer jurisdiction. Where the subject-matter is within the court's jurisdiction the appearance and submission of parties may justify the assertion of the jurisdiction, and prevent their afterward questioning it. *Tompkins* v. *Schomp, 16 Vr. 488; Funck* v. *Smith, 17 Vr. 484.* But where the subject-matter is not within the jurisdiction, neither consent nor acquiescence can confer the requisite jurisdiction. What cannot be done directly cannot be done indirectly. This principle has always been maintained in our courts with rigor. In *School Trustees* v. *Stocker, 13 Vr. 116,* the supreme court, using the language of Mr. Freeman (*Freeman on Judg.* § *120*), declared that neither the acquiescence of the parties nor their solicitations can authorize any court to determine any matter over which the law has not authorized it to act. In *State* v. *Conover, 2 Hal. 203,* a prosecutor in *certiorari* was permitted to question the jurisdiction of a court to make an order to appoint freeholders which was made on his motion and with his consent. Chief-Justice Kirkpatrick was of opinion that the order was without jurisdiction, and it was vacated. The opinion respecting the validity of the order has been since overruled, but the point for which the case is here cited has never been criticised. See, also, *Greenway* v. *Dare, 1 Hal. 305; Cottrell* ads. *Den, 3 Gr. 344; Ryno* v. *Ryno, 12 C. E. Gr. 522.*

In the federal courts, where jurisdiction to review depends on the existence of certain specified facts, it is held that where the facts do not appear, jurisdiction cannot be conferred by any agreement of parties respecting them. *Mordecai* v. *Lindsay, 19 How. 199; Montgomery* v. *Anderson, 21 How. 386; Ballance* v. *For-*

Dodd v. Una.

syth, *21 How. 389* ; *Merrill* v. *Petty, 16 Wall. 338.* In *Dudley* v. *Mayhew, 3 N. Y. 9,* a bill was filed to restrain an infringement of a patent-right, and the defendant stipulated not to object to the jurisdiction. Upon the bill being dismissed and an appeal taken, the court of appeals permitted the jurisdiction to be questioned, notwithstanding the assent and acquiescence.

For these reasons I think we are bound to hear appellant's objection to the jurisdiction, and since I conclude that jurisdiction to make the original order was wanting, I shall vote to reverse the order now appealed from.

To avoid any misapprehension, it is proper to say that I have not considered the question whether the court below, of its own motion, and to vindicate its own dignity, could have punished appellant for the violation of its unreversed order, nor whether, if such course had been taken, an appeal would have availed appellant. Nor have I designed to express any opinion on proceedings under the act of 1878, which act, it may be suggested, might have been resorted to by this institution when it took effect only a few months after the proceeding here considered.

DEPUE, J.

The proceeding for contempt is of two kinds. (1) To punish contemptuous conduct in the presence of, or with respect to the authority or dignity of the court. (2) As a method of affording relief *inter partes.* The first is a proceeding of a criminal nature, instituted by the court of its own motion—heard by it in a summary manner—and punishable by imprisonment until the contempt be purged, or by a fine payable to the state. The second is set on foot at the instance of parties aggrieved. Such a proceeding is remedial in its nature, and the relief afforded is by imprisonment until the party adjudged in contempt does justice to his adversary.*

---

*NOTE.—In a late case, *People* v. *Oyer and Terminer,* decided in New York court of appeals, January 19th, 1886, and reported in *3 East. Rep. 563, 1 Cent. Rep. 812,* Mr. Justice Finch says: "The occasion and results of proceedings for contempt furnish a clear and well-defined line of division, separating them into two classes, which have become somewhat mingled and confused by

Dodd v. Una.

An adjudication of a contempt of the class first mentioned is not appealable or reviewable upon the merits. If the court, in its constitution, has power to punish for contempt, its decision is final and conclusive. But where the proceeding is taken in the name of, and at the instance of parties, the adjudication of a contempt is appealable. The decisions which establish this distinction are cited in the briefs of counsel, and are accurately summarized by counsel of the respondents in these propositions : 1. Where the proceeding for contempt is remedial in its nature, either party aggrieved by the order of the court may appeal. 2. Where the proceeding for contempt is remedial in its nature and also involves punitory consequences, the party aggrieved may appeal. 3. Where the proceeding for contempt is purely for the purpose of punishing the contemner, no appeal therefrom lies by either party.

From the appealable character of an adjudication of contempt, it will necessarily follow that the validity of the order disobeyed is brought under review ; for the party asking for this process of the court can have no right to it, unless the court had authority to make the order on the disobedience of which the proceeding is founded. *Ex parte Fisk, 113 U. S. 713*, is a

the use of a fixed, but ambiguous nomenclature. * * * In one class are grouped cases, whose occasion is an injury or wrong done to a party who is a suitor before the court, and has established a claim upon its protection, and which result in a money indemnity to the litigant, or a compulsory act or omission enforced for his benefit. In these cases the authority of the court is indeed vindicated, but it is after a manner lent to the suitor for his safety, and vindicated for his sole benefit. The authority is exerted in his behalf as a private individual, and the fine imposed is measured by his loss, and goes to him as indemnity ; and imprisonment, if ordered, is awarded, not as a punishment, but as a means to an end, and that end the benefit of the suitor, in some act or omission compelled which are essential to his particular rights of person or of property. * * * If in this class of cases there exist traces of a vindication of public authority, they are but faint and utterly lost in the characteristic, which is strongly predominant, of protection to private rights imperiled or indemnity for such rights defeated. * * * If we describe this first class of contempts as private contempts, because their occasion and result is, primarily and in the main, the vindication of private rights, we shall avoid confusion or misapprehension. The second class of contempts are those whose cause and result are a violation of the rights of the public as represented by

weighty precedent in point. In that case Fisk was a party to a
suit commenced in a state court, and afterwards removed by him
to the circuit court of the United States. While the suit was
pending in the state court an order was made that Fisk appear
for examination before trial. After the case had been removed
to the federal court the judge of that court made an order that
the examination of Fisk should be continued before a master, to
whom the matter had been referred. Fisk refused to be sworn,
and declined to be examined under the latter order, and there-
upon the circuit judge made a further order that Fisk personally
attend before the court and submit to an examination. Fisk
appeared before the court, and, stating that he had been advised
by counsel that the court had no jurisdiction to require him to
answer in this manner, refused to do so. For this, on further
proceedings, he was held to be in contempt, fined $500, and
committed to the custody of the marshal until the fine should be
paid. On an application for a writ of *habeas corpus* to be re-
lieved from this imprisonment, the supreme court of the United
States reviewed the proceedings for contempt, and decided that
the circuit court had no power to make an order to compel a

their constituted legal tribunals, and a punishment for the wrong in the interest
of public justice, and not in the interest of an individual litigant. In these
cases if a fine is imposed, its maximum is limited by a fixed general law, and
not at all by the needs of individuals, and its proceeds, when collected, go into
the public treasury, and not into the purse of an individual suitor. The fine
is punishment rather than indemnity, and if imprisonment is added it is in the
interest of public justice and purely as a penalty, and not at all as a means of
securing indemnity to an individual. Necessarily these contempts, in their
origin and punishment, partake of the nature of crimes, which are violations
of the public law and end in the vindication of public justice, and hence are
named criminal contempts. *   *   * We have, then, two distinct classes—
private contempts and public contempts. Both were known to and recognized
by the common law, and the courts were held to possess an inherent power of
punishing by process of contempt any disregard of their authority, both for the
benefit of their suitors and for the protection of their own order and dignity.
Necessarily, the common law power was very broad and vested large discretion
in the courts. These became, in some instances, both accuser and judge, and
this was especially so where the contempt was of a public nature, and no pri-
vate person stood as complainant and sufferer."

Dodd *v.* Una.

party to submit to an examination before trial, and therefore no power to punish the party for his refusal to do so.

In delivering the opinion of the court, Mr. Justice Miller said that " whenever a court of the United States undertakes by its process of contempt to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void." And after discussing the powers of the circuit court, and reaching the conclusion that the court had not the power to make such orders, the learned justice adds : " The circuit court was, therefore, without authority to make the orders for the examination of the petitioner in this case, and equally without authority to enforce these orders by process for contempt." It will be observed that in the case cited the order in question was an order for the benefit of the plaintiff in the original suit, to give him the advantage of an examination of his adversary before trial ; and that it was made in a suit to which Fisk was regularly a party, and that the power of the court to make the order was decided on an application for a writ of *habeas corpus* to inquire into the cause of the petitioner's restraint in his liberty—a proceeding which called the order of the court in question collaterally.

In *New Orleans* v. *Steamship Company, 20 Wall. 387,* the appeal brought up an order punishing a party for contemptuous conduct towards the court—a punishment imposed for the vindication of the dignity of the court. A bill had been filed in the United States circuit court by the steamship company against the city of New Orleans, to enjoin the city from interfering with certain premises in which the company claimed a leasehold interest. Pending this litigation the mayor applied for and obtained an injunction out of a state court restraining the company from rebuilding an inclosure on the premises, which had been destroyed. The circuit judge, regarding the application to the state court as to anything within the scope of the litigation already pending before him as disrespectful to his court, proceeded against the mayor as for contempt, and imposed a fine of $300. The supreme court of the United States, on an appeal, held that it had

not the power to review the order of the circuit court adjudging a contempt, made for the purpose of vindicating the dignity of the court, and punishing an offender for disrespectful conduct towards the court.

These two cases cited from the federal courts illustrate the distinction between proceedings for contempt taken by the court itself for the punishment of persons guilty of contemptuous conduct derogatory to the dignity of the court, and the same proceedings when instituted at the instance of third persons for the disregard of orders of the court made for their benefit. In proceedings of the first class, the adjudication of the court is conclusive, and the order is not appealable. In such cases, as was said by Mr. Justice Patteson, if the court adjudicating the contempt has the power of committing for contempt, that adjudication cannot be reviewed; and if there be no objection to the form or manner of the warrant, the commitment under it cannot be interfered with. *In re Crawford, 13 Jur. 955–958.* In proceedings of the second class, an appeal will lie, and the validity of the order adjudging the contempt will depend upon the validity of the original order, on the disobedience of which the contempt was adjudged.

If the case brought up was capable of being treated as the action of the chancellor, taken with a view simply of vindicating the dignity of his court, I would vote to dismiss this appeal. But the record sent up does not admit of that construction. The proceeding, by this record, appears to have been instituted by certain parties who became depositors after the chancellor's orders were made. It was instituted by a petition by these depositors, setting out the orders of the chancellor for the investment of the funds of the institution received on deposit after a certain date, and that the managers of the institution made investments of funds received after that date in a manner and upon securities in disregard of these orders, and that in consequence of the loss sustained thereby, the institution became insolvent, and praying that the court would inquire into the conduct of the managers so far as the same related to acts done in violation of the said orders; and that if the same were dis-

Dodd v. Una.

·obeyed, the said managers, or any of them, found to have disobeyed said orders, be adjudged to be in contempt, and punished accordingly.   To this petition answers were filed by the managers, as in an ordinary chancery suit.    Testimony was taken in another state by commission, under section 38 of the act concerning evidence (*Rev. p. 384*), as if the suit was one of ordinary equity cognizance.    In his opinion on the application for a ·commission to take these depositions, the vice-chancellor expressly repudiated the idea that he was proceeding under the ·*quasi* criminal jurisdiction inherent in every court having power to punish for contempt, to which the power to punish for contempt is uniformly referred, and the commission was awarded that both parties might have full use of all means at the ·command of the court for the discovery of the truth.    *Una* v. *Dodd, 11 Stew. Eq. 460.*   The decree is entitled *inter partes.* It recites the filing and the substance of the petition ; that testimony was taken as well on behalf of said petitioners as on behalf of said managers ; that the court, having heard and considered the pleadings and proofs, and the arguments of the ·counsel of the petitioners and of all the managers, it was, on motion of the counsel of the petitioners, adjudged that the appellant had violated the said orders of the court, and that in so doing he was guilty of contempt ; and it was ordered that he ·appear for judgment on a certain day, and that the petition be dismissed as against the other managers, without costs.    Nowhere in the record does it appear that the chancellor was the ·actor, as the court always is, in proceedings to vindicate its own dignity.    None of the forms of procedure—an attachment, interrogatories served, answers filed, in which the party may have ·opportunity to purge the contempt, reference to a master to report whether the examination is full and satisfactory or not (*Dick. Ch. Pr. 124 and notes*)—was observed in this case ; for to justify punishment for contempt, it must appear that the dis-·obedience was of such a nature as to indicate a design to contemn the authority of the court—an intention to disregard its process ·and authority.    *State* v. *Trumbull, 1 South. 139, 140 ; Fraas* v.

*Barlement,* 10 *C. E. Gr.* 84–86 ; *Parrot* v. *Quernan, Stew. Dig..* 164 § 35.

Throughout the whole proceeding the vice-chancellor treated. the controversy as a matter *inter partes* as between the petitioners on the one side and the managers on the other side, and. in the opinion sent up with this appeal he regarded the validity of these orders and their binding force as against the managers. as the substratum of his judgment. On the case presented by this record I agree that the order adjudging the contempt is appealable, and that the validity of the orders for the disobedience of which the contempt was adjudged is drawn in question.

With respect to the invalidity of these orders, on jurisdictional grounds, I agree with the opinion of Mr. Justice Magie. The relation of a savings bank to its depositiors is a trust defined by its act of incorporation. By its charter the legislature established this institution, and by the charter and supplements prescribed the range of the investments in which the managers might, in their discretion, invest its funds. The charter also prescribed that the managers should regulate the rate of interest to be allowed to depositors, so that the depositors should receive a ratable proportion of the profits, as near as might be, after deducting all necessary expenses, and a reasonable surplus or contingent fund, and each depositor was to be repaid his deposit at such times and with such interest and under such regulations as the board of managers should from time to time prescribe. By these legislative prescriptions every depositor was entitled to share equally in the profits that might be realized by the institution while his money remained on deposit, so long as the institution continued to transact business, without regard to the time when he became a depositor, and to withdraw his deposit subject only to such regulations as the board of managers might adopt with reference to all deposits. With respect to the management of the institution, the investment of its funds, participation in. the profits made by the institution, and the withdrawal of deposits, the charter placed all depositors, without any distinctions, on an equality. The orders in question undeniably changed the constitution and terms of the trust as established by the legisla-

ture.   These orders prescribed the investments in which moneys deposited thereafter should be invested, and limited the range of the  investments contemplated by the legislature, forbade the repayment of the moneys of prior depositors, except under the chancellor's orders, and directed that all moneys deposited thereafter should be treated as special deposits and invested in a designated manner ; that separate accounts thereof should be kept, and that the actual interest received thereon, after deducting necessary expenses and taxes, should be paid as dividends upon such special deposits, excluding former depositors whose moneys were retained in the institution from participation in the profits realized from such investments.   These orders wrought a radical change in the charter of the institution.   Such a change in the constitution and terms of the trust the court had not the power to make in virtue of its general jurisdiction over trusts.   A power adequate to that end could be derived only from legislative authority, from some statute conferring additional powers upon the court of chancery ; and there was not, when these orders were made, any statute by which such powers were granted.

However beneficial these orders may have been in the embarrassed condition of the institution at the time they were made, when they are brought under judicial cognizance we have no discretion but to inquire into the power of the court to make them, and to solve the problem of their validity or invalidity according to the result of that inquiry.

Nor did these orders acquire validity in the fact that they were made in the form of a judicial proceeding.   They were made on a summary application, and without the necessary parties to justify a judicial proceeding.   The theory that the managers before the court making the application in the name of the institution, and the managers consenting to it, was such an appearance as to make that proceeding a suit with adverse parties, is too unsubstantial to sustain the conclusiveness of a judgment or decree.   On that theory any trustee might come into court under the pretext of obtaining directions in the execution of his trust, and have the trust moulded, perhaps changed, without

46

the *cestuis que trust* having opportunity to be heard, or right to appeal. In England, under acts of parliament which gave to the English chancellor extensive discretionary powers over charitable trusts, to be exercised in a summary manner—a power which is wanting in this instance—the courts hold that there is no power in the court to alter the constitution of a charity—that in proceeding under a statute of that kind the application is not to be heard *ex parte*—that opportunity is to be afforded to persons whose rights may be affected by an order made in the premises, to be heard either by the attorney-general or by some one who, in fact or in law, may be considered as their representative, on whom notice of hearing is required to be served—and that an order not in conformity with the statute, or made without the presence of proper parties, is a nullity. *2 Dan. Ch. Pr. 1533–1557; Ex parte Bolton School, 2 Bro. C. C. 662; Ex parte Seagears, 1 Ves. & B. 496; Ex parte Rees, 3 Id. 10–12; Attorney-General* v. *Green, 1 Jac. & W. 303, 305, 307; Hall's Charity, 14 Beav. 115–120, note; Wellbeloved* v. *Jones,1 Sim. & Stu. 40.*

With regard to jurisdiction by consent, that subject has been disposed of by Mr. Justice Magie in his opinion. I need add nothing. An essential quality of estoppels by the record is that they shall be mutual ; and where a suit is so imperfect that there can be no mutuality, the judgment or decree in it is binding on no one. *1 Smith's Lead. Cas. (8th ed.) 1108; Briscoe* v. *Stephens, 2 Bing. 213.*

If the investments complained of were made in violation of the act of 1878 (*P. L. of 1878 p. 393*), as modified by the act of 1881 (*P. L. of 1881 p. 286*), or funds of the institution were lost by the mismanagement of the managers, the remedy is by a suit in the name of the receiver, and not by individual depositors.

For the reasons I have assigned, I concur in the judgment of reversal.

Justices REED and VAN SYCKEL concurred in this opinion.

For dismissal—DIXON—1.

For affirmance—CLEMENT—1.

For reversal—THE CHIEF-JUSTICE, DEPUE, MAGIE, REED, VAN SYCKEL, BROWN, COLE, PATERSON—8.